Christophe A.G. TULOU, Secretary of the Department of Natural Resources and Environmental Control, Appellant,

v.

RAYTHEON SERVICE COMPANY, a Delaware corporation, Appellee/Applicant–Below,

and

The Environmental Appeals Board of the State of Delaware.

Civ. A. No. 94A–05–3.

Superior Court of Delaware, New Castle County.

Submitted: Nov. 1, 1994.
Decided: March 6, 1995.

David L. Ormond, Jr., Deputy Atty. Gen., Dept. of Justice, Wilmington, for Christophe A.G. Tulou, Secretary of the Dept. of Natural Resources and Environmental Control.

Stephen E. Herrmann, of Richards, Layton & Finger, Wilmington, for Raytheon Service Co.

## OPINION

HERLIHY, Judge.

Christophe A.G. Tulou, Secretary [Secretary] of the Department of Natural Re-

sources and Environmental Control [DNREC] appeals the decision of the Environmental Appeals Board [Board] which reversed the Secretary's denial of a construction permit filed by Raytheon Service Company [Raytheon]. The Board remanded the matter to the Secretary for the issuance of a construction permit. This appeal followed.

The present appeal presents two separate issues. The first being necessary to decide the second. The initial issue is the determination of the function of both the Secretary and the Board, primarily the Board's review of decisions of the Secretary and their relationship to each other. Once the level of review is established, this Court can resolve the conflict presented by Raytheon's request for the construction permit.

## FACTS

The Delaware Solid Waste Authority [DSWA] owns the Delaware Reclamation Project [DRP] which is operated under contract by Raytheon[1]. The DRP is located on the Delaware River at Pidgeon Point in New Castle, Delaware.

DRP processed waste generated by Wilmington and New Castle County. The processed waste included solid waste (garbage) and sewage sludge. DRP was designed to recycle, from solid waste, refuse-derived fuel and burnable garbage, metals and glass. The non-recyclable organic residue which remained was mixed with sewage sludge and composted in four digesters. The resulting compost was intended for sale as fertilizer.

During the composting process, the digesters released foul smelling fumes. Each digester used a fifty-foot stack with deamine (a masking/neutralizing agent) added to the emissions in an attempt to reduce the offensive odors.[2] Approximately 40,000 cubic feet per minute of gases were emitted by each digester totaling 160,000 cubic feet per minute for the four digesters.

DNREC has received numerous complaints from nearby property owners regarding the odors. Since 1984, DNREC has brought numerous enforcement actions against Raytheon, including 44 arrests and convictions of DRP.

To curb the odor problem, Raytheon has most recently proposed to link and combine the four digesters and existing emission stacks through ventilation pipes which would pump the emissions into a chemical neutralization chamber. The proposal includes adding one-half gallon of deamine per hour to the chamber. The resulting air would then be vented, with the aid of a fan, through a single 150–foot dispersion stack.

DNREC regulates DRP through statutes and regulations governing solid waste and the control of air pollution. As part of the new solid waste management regulations adopted by DNREC, which became effective in December 1989, DNREC requires that a solid waste facility, such as DRP, apply for a permit to operate. In addition, DNREC air pollution regulations require a permit to construct an air pollution control device, such as the dispersion stack presently proposed by Raytheon. In following the regulations, Raytheon applied for the operating permit for the facility without the proposed additions, as well as a permit to construct the odor abatement system improvements.

## PROCEDURAL POSTURE

### Hearing Before the Secretary

After Raytheon applied to the Secretary for the necessary permits, the Secretary held a hearing on the applications on February 2, 1993. The record before the Secretary consisted of testimony from residential neighbors, Senator David McBride, Peter Drottar [Drottar], Manager of Raytheon's Environmental Engineering Services Group, Richard Duffee [Duffee], an expert in dispersion meteorology and odors, and John Robinson [Robinson], an expert in computer atmospheric dispersion modeling. Both Duffee and Robinson appeared on behalf of Raytheon.

---

1. Hereafter, Raytheon and DRP will be used interchangeably.

2. It appears that the source of the odors is a release of dimethyldisulfides. There is testimony that deamine is not the proper masking/neutralizing agent to combat dimethyldisulfides.

Computer dispersion modeling is the mathematical prediction of mixing different concentrations of gases in the atmosphere and the resulting effects in concentrations downwind under varying meteorological conditions. One essential measurement in determining gaseous concentrations is the dilution to threshold [D/T]. One D/T is the concentration of odorous gases in the air we breathe at which half of the people detect some odor while the other half do not perceive an odor.[3] Larger expressions of D/T are simply multiples of the concentrations found in one D/T. For instance, a reading of 25 D/T is 25 times more concentrated than those measured at one D/T. Dispersion models then predict the concentrations at various points downwind from the stacks. A Raytheon expert testified that in his opinion, the odor concentration out of Raytheon's four stacks was approximately 200 D/T.

There are several models that are used to predict odor concentrations. Raytheon's expert Robinson, used an integrated gaussian model [IGM] to predict the gaseous concentrations if the proposed dispersion stack were built. As with any model, the data input is crucial, in this case, the odor concentrations exiting the stack. Robinson used 300 D/T as the input figure which is based on the 1992 mean odor measurement of 200 D/T, plus a 50 percent increase to cover potential variances in operating conditions. Based upon a comparison with results of a 1988–89 IGM model, Robinson predicted a "40–fold reduction" in odor concentration.

DNREC questioned Drottar, also a Raytheon expert, regarding a 1988–89 report he submitted to DNREC predicting that a significant dilution of air, combined with deamine would solve the odor problem then existing. Other than the proposal to build the single 150–foot dispersion stack, this was the same method of odor control presently proposed. At the time of the 1988–89 report, the dispersion modeling predicted an 86 percent reduction in odors. It was found, however, that once implemented, the dilution of

air and addition of deamine did not effectively reduce the odors.

According to Drottar and Duffee, the 1988–89 model did not accurately predict odor reduction because the initial data of stack emission was assumed to be 128 D/T. This number is too low since current measurements are 200 D/T. Duffee also stated that the 1988–89 model was not done properly because it did not have a sufficient number of receptors to determine maximum concentrations. During that study, there were two receptors at particular locations to measure gaseous concentrations downwind. Although the 1988–89 modeling was deficient in certain areas, Robinson, nevertheless, used those results for comparison in predicting concentrations with the proposed 150–foot stack.

An additional theory raised by the parties attempts to account for the unreliable results revealed by the dispersion model. This theory was originally posed by Dr. James Dunson, which suggests that heavy oils, such as terpenes, present in the emissions may have the capability of absorbing odorous compounds and carrying them farther downwind than predicted. DNREC argues that the modeling performed by DRP did not take into account this theory which could adversely affect odor predictions. Raytheon responded to this theory, in part, by letter from Dr. Dunson, who stated that notwithstanding the terpene theory, he endorses the proposed dispersion stack.

DNREC also inquired whether the IGM modeling was appropriate in predicting odors. The basis for its concern was that the IGM model predicts average concentrations over a ten-minute period while odors occur in a matter of seconds. DNREC stated that a model to predict short-term concentrations would be more accurate under these circumstances. The "puff" model would measure such short-term concentrations.

The puff model was previously run by Raytheon in 1991. That model used approximately 500 D/T for a single hypothetical

---

**3.** The D/T valuation has also been defined in more detail as the number of equivalent air volumes with which the sample must be diluted for 50 percent of the members of an odor sampling panel to be unable to detect any odor in the sample.
Raytheon answering brief, footnote 2 at 10.

stack[4], the same height as presently proposed by Raytheon. The results of that model predicted the range of concentrations from 7.5 D/T to 57 D/T, which, according to DNREC, is unacceptable.

More recently, Raytheon performed a test using the puff model approximately one month prior to the 1993 hearing. Raytheon did not have the results of that model nor could it predict the approximate results at that time. The results of the modeling, however, were presented later at the Board hearing.

Other methods of odor control were discussed, including a facility in Montgomery County, Pennsylvania. That facility used deamine and dispersion, along with a chemical mist scrubber to alleviate the odors. Although there was disagreement as to how comparable the Montgomery County site is with DRP, there were still odor complaints regarding that facility.

Secretary Edwin H. Clark, II, the head of DNREC presiding over the 1993 hearing, inquired whether there were any composting facilities successfully using a dispersion stack and masking agents such as deamine. DRP stated that there were but has not provided any documentation to that effect.

There was a statement by the manufacturer of deamine that sulfur compounds such as dimethyl disulfide [DMDS] are generally unaffected by deamine treatment. As stated previously, DMDS is a substantial cause of the foul-smelling gases responsible for citizen complaints and citations against Raytheon.

With several unanswered questions, the parties agreed to meet the following day to refine the questioning. The record remained open in order for Raytheon to respond to the questions in writing. DNREC responded to Raytheon's post-hearing responses by memorandum from Ali Mirzakhalili dated February 22, 1993.

With the record complete, on May 7, 1993, the Secretary denied the permit to construct the odor abatement system improvements, including the dispersion stack and accompanying facilities. The Secretary granted the solid waste operating permit for DRP as it existed, without the additions, by order dated May 7, 1993, on the condition that they cease operation of the digesters.[5]

The Secretary's denial of the permit to construct the 150-foot emissions stack system was based on several grounds. First, the Secretary noted the long-standing and frequent complaints about the odors. He noted 206 complaints in 52 days during a six-month period immediately prior to the hearing. The Secretary cited the interference with the nearby residents' enjoyment of their homes created by the odor. He noted the negative impact on property values.

Second, the Secretary mentioned the problems created for downwind locations created by terpenes in the compost gases, a phenomenon not accounted for in the IGM model. The Secretary reviewed with concern the evidence that the sampling methodology may be inadequate because of the four-hour delay between taking samples and their analysis leading to an under estimate of the actual odors emitted.

Third, the Secretary recited a number of previously proposed DRP solutions to the odor problem. The models previously proposed were unsuccessful in reducing odors. Finally, the Secretary noted that the 1991 puff model of a 150-foot dispersion stack still left odor concentrations downwind at a very objectionable level. Even assuming some faults with the 1991 study, enough doubt remained to indicate the 1993 puff model still was not an accurate prediction of odors.

4. The greater D/T apparently reflects the higher concentrations potentially present in a single stack as opposed to the current setup consisting of four emissions stacks.

5. With the Secretary's order to cease operation of DRP's sewage sludge processing module, the City of Wilmington contracted with VFL Technology Corporation to process Wilmington's sludge at a savings of approximately $2–3 million for the fiscal year 1994. Apparently, all of the processed sludge is now being used as landfill cover at DSWA's landfill. The sustainability of the current uses for the sludge has been estimated to be beyond five years. Affidavit of Kash Srinivasan, Director of Water Division, Department of Public Works, Wilmington, Delaware, dated February 14, 1994.

DRP appealed the Secretary's orders to the Board on May 20, 1993, relating solely to the construction permit. The order regarding the operating permit has not been appealed.

In preparation for the hearing, DRP listed Dr. Bruce Turner [Dr. Turner] as an expert witness to appear before the Board. Dr. Turner is an expert in computer atmospheric dispersion modeling. DNREC objected to the naming of Dr. Turner and filed a motion *in limine* to exclude this testimony on two grounds. First, DNREC argued that Dr. Turner did not testify before the Secretary. Second, DNREC argued that his testimony was irrelevant, immaterial, cumulative and unduly repetitive pursuant to 7 *Del.C.* § 6008(b), and thus, improper. The Board denied the motion.

### Board Hearing

The Board held a hearing on February 22, 1994. In supplementing the record before the Secretary, the Board heard testimony from Dr. Turner.[6] Dr. Turner testified that the 1993 puff model results were consistent with the IGM results which predicted the odor concentrations of the proposed dispersion stack. Dr. Turner also testified regarding the comparison between the 1988–89 IGM model results and the 1993 IGM results, forecasting the odor concentrations of the proposed dispersion stack. Dr. Turner concluded from this comparison that the proposed dispersion stack would result in reductions in odor of $\frac{1}{29}$th at 1 kilometer and $\frac{1}{11}$th at 5 kilometers. These concentrations were based on one-hour time periods giving average concentrations during those periods.

DNREC presented residential neighbors of DRP who testified regarding the disruption of their lives due to the odors emitted by DRP. In addition, Ali Mirzakhalili testified to his reservations and concerns regarding the proposed emissions stack. He expressed concern for the flawed methodology of D/T measurement, the use of deamine, data input and selective elimination of 1991 data without justification, as well as application of 1988–89 puff model results to the proposed stack.

In addition, Ronald Graeber, DNREC's program manager for the Division of Water Resources, and Richard Folmsbee, DNREC's Environment Program Manager for the Solid Waste Branch, testified regarding Raytheon's failure in recycling and in producing a marketable product. Although the fertilizer, the end product from composting the garbage residue and sewage sludge, was intended for sale, very little of this product was ever sold. In addition, the recycling was not as successful as planned. In fact, most of the resulting products from the operation, including composted garbage, sewage sludge and recycled garbage have ended up in landfills. The facility built at DRP to burn some of the garbage as energy producing fuel and the glass recycling was closed down in 1991. The burnable garbage was and continues to be shipped out of state for burning at a cost to DSWA. Although there appears to be a substantial savings associated with ceasing the above operation, it is unclear how much the savings will be offset by the added expense of trucking the trash to the incineration plant in Chester, Pennsylvania.

The Board found that DNREC's reservations in denying the construction permit were justified yet it held that the evidence before the Board overcame those reservations. In support of that finding, the Board found Raytheon's scientific testimony, testing and conclusions to be credible and that on paper, Raytheon convinced the Board that its proposal was sound and that it would significantly reduce odors.

After the hearing in April 1994, the Board reversed the Secretary's orders by a four-to-one vote and remanded the permit application to the Secretary for the issuance of a conditional construction permit. The Board relied heavily upon Dr. Turner's testimony in reaching this decision. DRP was given permission by the Board to construct its new system and test it. The Board stated that DRP had to satisfy DNREC that it had sufficiently reduced the odors. The Board was not convinced that DRP would succeed

---

6. DRP also presented testimony of Ronald Ste-    flick, their facility manager.

but felt it should be allowed to try. DNREC filed the current appeal on May 4, 1994.[7]

## PARTIES' CONTENTIONS

DNREC makes several arguments on appeal. DNREC argues that:

I. The Board erred as a matter of law in reversing the Secretary because the Secretary's decision was supported by substantial evidence and by competent evidence having probative value.

II. The Board erred as a matter of law by substituting its judgment for that of the Secretary and by failing to give any deference to the Secretary's expertise.

III. The Board erred as a matter of law and abused its discretion by refusing to consider the DRP's lack of social utility.

IV. The Board erred as a matter of law by shifting the burden of proof from [DRP] to DNREC.

V. The Board erred as a matter of law and abused its discretion by denying DNREC's motion *in limine* to exclude [DRP]'s new expert testimony.

Raytheon argues that the decision of the Board is supported by substantial evidence and should be affirmed by this Court. Raytheon also contends that the Board properly heard Mr. Turner's evidence.

## STANDARD OF REVIEW

On an appeal from the Board, this Court's role is to determine whether the Board's decision is supported by substantial evidence and is free from legal error. 29 *Del.C.* § 10142; *Stoltz Management v. Consumer Affairs Board*, Del.Supr., 616 A.2d 1205, 1208 (1992). Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Oceanport Industries v. Wilmington Stevedores*, Del.Supr., 636 A.2d 892, 899 (1994). Further, this Court does not substitute its judgment for that of the Board, even if it would have reached a different conclusion. *Director of Revenue v. Stroup*, Del.Super., 611 A.2d 24, 26 (1992).

## DISCUSSION

### A

The Court's analysis of the Board's decision to reverse the Secretary necessarily starts with the regulatory and statutory framework relating to this controversy. The foundation of this scheme was the establishment of DNREC pursuant to 29 *Del.C.* § 8001. The Secretary shall be a person qualified by training and experience to perform the duties of the administrator and head of DNREC. 29 *Del.C.* § 8002(a). One of the primary tools of enforcement is 7 *Del.C.* Ch. 60, entitled Environmental Control. The purpose of this chapter is the protection of the environment. *State v. Getty Oil Co.*, Del.Super., 305 A.2d 327 (1973). It is the Secretary's function to enforce this chapter. 7 *Del.C.* § 6005(a). These powers are broad in the pursuit of giving full force and effect to the legislative mandate of the Environmental Control Act.[8]

---

**7.** Pursuant to Superior Court Civil Rule 72, 29 *Del.C.* § 10142 and 7 *Del.C.* § 6009. Section 6009 provides that:

(a) Any person or persons, jointly or severally, or any taxpayer, or any officer, department, board or bureau of the State, aggrieved by any decision of the Board, may appeal to the Superior Court in and for the county in which the activity in question is wholly or principally located by filing a petition, duly verified, setting forth that such decision is illegal, in whole or in part, specifying the grounds of the illegality. Any such appeal shall be perfected within 30 days of the receipt of the written opinion of the Board.

(b) The Court may affirm, reverse or modify the Board's decision. The Board's findings of *fact* shall not be set aside unless the Court determines that the records contain no substantial evidence that would reasonably support the find-

ings. If the Court finds that additional evidence should be taken, the Court may remand the case to the Board for completion of the record.

(c) No appeal shall operate to stay automatically any action of the Secretary, but upon application, and for good cause, the Board or the Court of Chancery may stay the action pending disposition of the appeal.

**8.** (a) *Findings.*—The General Assembly hereby makes the following findings concerning the development, utilization and control of the land, water, underwater and air resources of this State:

\* \* \* \* \* \*

(5) The land, water, underwater and air resources of the State must be protected from pollution in the interest of the health and safety of the public;

In order to construct and use any equipment which may cause or contribute to the discharge of an air contaminant[9] one must obtain a permit from the Secretary. 7 *Del.C.* § 6003(b)(1). After following statutorily specified advertising and notice procedures, the Secretary holds a hearing on the permit application. 7 *Del.C.* § 6004. The hearing procedure is also statutorily prescribed, including the right of the applicant to have counsel, to subpoena witnesses, to present witnesses and evidence. 7 *Del.C.* § 6006(3). The hearing is transcribed. *Id.* These procedures were utilized and followed in this matter. In addition to the evidence at the hearing in this case, post-hearing material was submitted to the Secretary by DNREC and DRP.

Upon the Secretary's denial of the permit application, DRP appealed to the Board which "is a quasi-judicial review board which is constituted in order to hear appeals of decisions of the Secretary." 7 *Del.C.* § 6007(b). After the Board reversed the Secretary, the Secretary appealed the decision to this Court. 7 *Del.C.* § 6009(a).

### B

The focus of the analysis must necessarily shift to the specific statute governing appeals of Secretarial permit application decisions to the Board. That statute reads as follows:

> Whenever a final decision of the Secretary concerning any case decision, including but not limited to any permit or enforcement action is appealed, the Board shall hold a public hearing in accordance with Chapter 101 of Title 29. The record

before the Board shall include the entire record before the Secretary. All parties to the appeal may appear personally or by counsel at the hearing and may produce any competent evidence in their behalf. The Board may exclude any evidence which is plainly irrelevant, immaterial, insubstantial, cumulative or unduly repetitive, and may limit unduly repetitive proof, rebuttal and cross-examination. The burden of proof is upon the appellant to show that the Secretary's decision is not supported by the evidence on the record before the Board. The Board may affirm, reverse or remand with instructions any appeal of a case decision of the Secretary.

7 *Del.C.* § 6008(b).

The Secretary's first dispute on the appeal involves the Board's denial of his motion *in limine* to exclude the testimony of Dr. Turner.

Section 6008(b) states that the record before the Board includes the entire record before the Secretary. However, the Board has the power to expand upon the record by accepting "competent evidence" produced by any party to the appeal. *Id.* In addition, the Board is empowered to reject certain evidence such as evidence which it finds cumulative or "insubstantial". *Id.*

Thus, statutory language grants to the Board broad discretionary power regarding the record it is to consider. This Court has previously held that it is a denial of an appellant's due process rights for the Board to limit the evidence before it to that evidence considered by the Secretary. *T.V.*

---

(6) The land, water, underwater and air resources of the State can best be utilized, conserved and protected if utilization thereof is *restricted to beneficial uses and controlled by a* state agency responsible for proper development and utilization of the land, water, underwater and air resources of the State;

\* \* \* \* \* \*

(c) *Purpose.*—It is the purpose of this chapter to effectuate state policy by providing for:
(1) A program for the management of the land, water, underwater and air resources of the State so directed as to make the maximum contribution to the interests of the people of this State;
(2) A program for the control of pollution of the land, water, underwater and air resources

of the State to protect the public health, safety and welfare;

\* \* \* \* \* \*

(6) A program for improved solid waste storage, collection, transportation, processing and disposal by providing that such activities may henceforth be conducted only in an environmentally acceptable manner pursuant to a permit obtained from the Department.
7 *Del.C.* § 6001.

9. "Air contaminant" means particulate matter, dust, fumes, gas, mist, smoke or vapor or any combination thereof, exclusive of uncombined water.
7 *Del.C.* § 6002(2).

*Spano Bldg. Corp. v. Wilson,* Del.Super., 584 A.2d 523, 530 (1990). In *T.V. Spano,* the first hearing afforded was before the Board. The Secretary had taken emergency enforcement action and issued a decision without conducting a hearing. While the case *sub judice* involves a full adversarial hearing before the Secretary, *T.V. Spano* clearly stands for the proposition that the Board is empowered with the discretion to hear additional evidence. The scope of the use of the additional evidence in a two-hearing case such as this is a key ingredient to the resolution of the dispute now before the Court.

Furthermore, in the subsection governing appeals to the Board of regulation decisions by the Secretary, the Board is authorized to consider new evidence if "it is relevant to or clarifies those issues in the record before the Secretary." 7 *Del.C.* § 6008(c). Clearly by this language and the language found in subsection (b), the legislature fully intended for the Board to have the power and discretion to hear additional evidence. This Court must give effect to that unambiguous language. *Spielberg v. State,* Del.Supr., 558 A.2d 291, 293 (1989).

DNREC moved to bar Dr. Turner's testimony because he had not testified before the Secretary. It also argues now that Dr. Turner offered nothing new. This Court holds that it was proper to deny DNREC's motion *in limine* based on their argument that Dr. Turner had not testified before the Secretary. The statutory scheme just discussed does not support such an argument. While Dr. Turner's testimony touched on much of what the Secretary considered, this Court cannot find the Board abused its discretion in allowing him to testify.

■ In addition to the arguments against Dr. Turner, both parties have raised in this Court issues about the credibility or qualifications of witnesses used by their opponents at the Board hearing. Whether a witness' credibility is to be questioned, for example, because of his employment relationship with the party for whom he appears, is a matter to be considered by the fact finder and not this Court. *Coleman v. Department of Labor,* Del.Super., 288 A.2d 285, 287 (1972).

*C*

■ The Secretary argues that the Board gave no or insufficient deference to his expertise. In § 6008(c), which applies to appeals of regulations, there is explicit language requiring the Board to "take due account of the Secretary's experience and specialized competence." There is no equivalent language in § 6008(b).

However, this Court has stated that Secretarial decisions on permits and enforcement, that is, those decisions appealed under § 6008(b), are to be given some deference by the Board.

> I further conclude that a reasonable explanation for this peculiar vote requirement makes good-government sense where the decision of a specially qualified Secretary, 29 *Del.C.* § 8002(a), is to be rejected by members of the general citizenry of the state who need not be specially qualified to serve on the [Board].

*Wilson v. Texaco Refining and Marketing, Inc.,* Del.Super., C.A. No. 88A–MR–5, 1989 WL 89614, Poppiti, J. (August 7, 1989), *aff'd. sub nom,* Del.Supr., 570 A.2d 1146 (1990).

The question of the appropriate deference to be afforded the Secretary's decision is tacitly raised by the broad language in § 6009(b). This section lumps together appeals to the board of two different types of Secretarial decisions. One type involves appeals of permit decisions and the other entails appeals of enforcement decisions. In *T.V. Spano,* the appeal to the Board involved a decision by the Secretary to revoke a permit in an emergency situation. In the case of *Formosa Plastics Corp. v. Wilson,* Del. Supr., 504 A.2d 1083 (1986), the appeal involved a decision by the Secretary to revoke a permit in an emergency situation. Rather than appeal to the Board, *Formosa Plastics* sought, but was denied, an injunction barring the revocation of its operating permit. The Supreme Court affirmed the denial of the request for an injunction. *Id.* at 1091.

While this case involves an appeal of one of the two types of Secretarial decisions, namely, a permit decision, the matter came to the Board after a full adversarial hearing. Therefore, § 6008(b) is not only invoked on

appeals of permit and enforcement decisions of the Secretary, it is invoked when there has not been a hearing before the Secretary and where there has been a hearing. However, the statutory language on its surface draws no distinction between the standards to be applied where there has or has not been a hearing. Logically, however, the same rules cannot apply.

■ In addition, § 6008(b) needs to be interpreted in drawing this distinction to avoid the absurd result of treating initial Board hearings the same as where the Board holds the second hearing. This Court is compelled to interpret statutes to avoid absurd results. *Murphy v. Board of Pension Trustees*, Del.Supr., 442 A.2d 950, 951 (1982).

Since § 6008(b), as currently written, encompasses circumstances where the initial full adversarial hearing is before the Board, it is readily evident why the Board must be allowed to receive additional evidence. Also, in situations where the Board provides the first hearing, there is less apparent need for explicit deference to the Secretary's expertise.

Section 6008(c) involving appeals to the Board of regulation decisions of the Secretary necessarily contemplates appeals after the Secretary has held full hearings. Since regulations can often involve technical matters and since the Board is holding a second hearing, it is more apparent why § 6008(c) explicitly requires the Board to defer to the Secretary's expertise and does not contain the broader discretion found in § 6008(b) to receive and consider additional evidence.

Even though the same explicit statutory language is absent in § 6008(b), in cases like this involving the Board conducting the second hearing, the application of § 6008(b) to a two-hearing case cannot be identical to the initial hearing circumstances of *T.V. Spano.* Therefore, by analogy, § 6008(c) provides a modicum of guidance in delineating procedures and guidelines between an initial hearing case and a two-hearing case.

The Court is mindful that someone might say that using § 6008(c) as even a small guide in this matter and/or saying § 6008(b), in its application, must treat initial hearings

differently than second hearings amounts to judicial legislation. By lumping together two distinct settings, the statute becomes ambiguous and it then becomes incumbent on the Court to effectuate the legislative intent. *Richardson v. Wile*, Del.Supr., 535 A.2d 1346, 1348 (1988).

Even though the Board heard this appeal under § 6008(b), the Secretary had a full adversarial proceeding and considered post-hearing evidence. The record the Board starts with in a circumstance such as this is necessarily more complete and represents an effort by both parties to make their case before the Secretary. Additionally, this proceeding involved the submission to and consideration by the Secretary of a fair amount of technical evidence.

Accordingly, where the Secretary, as a person necessarily holding technical expertise, makes a decision involving consideration of technical evidence following an adversarial proceeding, the Board must give the Secretary's decision some deference, since the Board is holding a second hearing. It is impossible to quantify how much deference is due without more explicit statutory language, nevertheless, such deference must be given.

### D

Section 6008(b) states that the appellant to the Board has the burden of proving that, based on the record before the Board, the Secretary's decision is not supported by the evidence. That record starts with the "entire record before the Secretary". *Id.* The Secretary argues the Board did not give any deference to him.

■ Since the record in this case reflects, as noted, a full adversarial proceeding and the weighing of technical evidence, an appellant's burden must be more substantial than where the Board proceeding is the initial hearing. Much of the "new" evidence which DRP presented was technical in nature. Here, such evidence was designed to re-establish the credibility of the technical evidence which DRP presented to the Secretary but which he rejected. In evaluating such evidence to determine whether it showed the Secretary had *no* evidence, the Board must

not only give some deference to the Secretary, it must be convinced that it means the Secretary had *no* evidence. That is, an appellant must prove to the Board that the Secretary *lacked* evidence to support his decision.

■ Following an adversarial hearing where conflicting technical evidence is heard by the Secretary, the Board must treat with greater caution technical evidence which the Secretary did not hear and weigh. Otherwise, the proceeding before the Secretary is unduly depreciated.

■ While the statute lumps together Board proceedings which represent initial hearings with second hearings, the two proceedings must remain distinct. *T.V. Spano* analyzed the former. The present case represents the latter. The record before the Secretary in a case such as this must be given greater weight. This translates into making the appellant's burden heavier. The heavier burden is even more critical when the Secretary is analyzing technical evidence and the Board hears technical evidence the Secretary did not hear.

■ The record before this Court includes the record before the Board. When the record is viewed in light of the additional evidence presented to the Board, the need for Board deference, and DRP's heavier burden, the Board's reversal of the Secretary's decision cannot be sustained.

### E

An analysis of the Board's reversal of the Secretary's decision to deny DRP a permit to operate the new dispersion stack system reveals how the Board erroneously viewed the state of the record and erred by finding no evidence existed for the Secretary's decision. The Board itself stated:

> [DRP]'s past attempts to reduce the odor problem have been unsuccessful and its past predictions on odor reduction have not been accurate. For these reasons, DNREC viewed [DRP]'s proposal from the start with skepticism.

Board Findings of Fact at ¶ 9. Later, the Board stated:

> While the evidence before the Board (and the Secretary) supported closure of the digesters . . .
>
> DNREC's witnesses did cast legitimate doubt on [DRP]'s evidence and conclusions.
>
> Also, [DRP]'s past solutions to the odor problem have not been successful.

Board Conclusions of Law.

Despite these statements, the Board determined that in its presentation to the Board, DRP overcame these problems and reservations and, in effect, determined the Secretary had no evidence to support his decision. The Board credits DRP for using accepted techniques to predict the success of its proposal. The Board was satisfied that "on paper", DRP's proposal would significantly reduce odors.

However, the Board does not reconcile the fact that similar "sound" scientific methodology was used before but proved to be inaccurate. Further, there is a reclamation facility which uses the proposed odor reduction method to be used here but which has been unsuccessful. DRP told the Board that there were other similar facilities successfully using the odor reduction methodology it proposed here. At no stage were these facilities identified so that this statement could be verified. This "reality" is not weighed against proposed solutions.

The Board's decision to reverse the Secretary and direct him to issue a conditional construction permit to test DRP's proposal and shut DRP down if it does not work betrays Board doubts about the efficacy of DRP's proposal. It is very difficult to reconcile these doubts with its determination that DRP showed the Board there was *no* evidence to support the Secretary's decision.

The acknowledgment by the Board of doubts about DRP's credibility, its failure to live up to its prior predictions and its reversal of the Secretary, based upon the testimony of one witness not heard by the Secretary, manifest that the Board did not appreciate in this case the heavy burden DRP carried to prove the error, *i.e.,* lack of evidence, of the Secretary's decision. Since the record before the Board included the evidence before

the Secretary which he clearly accepted and the record before this Court also includes that evidence, the Court finds the Board erred as a matter of law in finding the Secretary's decision was not supported by the evidence.

While the general, long-standing proposition is that an administrative agency or fact finder, such as a jury, is entitled to believe one expert over another, *Standard Distributing, Co. v. Nally*, Del.Supr., 630 A.2d 640, 646 (1993), that rule becomes more difficult and complex to apply in this case because of its procedural posture and the language of § 6008(b).

In this case, the Board used DRP's expert's testimony to find that the Secretary's decision lacked supporting evidence. The Secretary, as noted, did not hear this witness. Therefore, unlike the usual application of the above rule, the same fact finder did not hear all of the evidence. In effect, the expert's testimony was an effort to rebut evidence before the Secretary not to show there was no evidence. At best, that effort may put all of the evidence in equipoise. Under that circumstance, the Board erred when it held DRP had met its burden of proof.

*F*

In his decision to deny DRP's permit, the Secretary stated that DRP had not demonstrated it could operate in a way so as not to constitute a private or public nuisance. The Secretary argues to this Court that the Board erred by overlooking this finding and by not considering whether DRP's operation poses a public or private nuisance.

In its Conclusions of Law, the Board stated:

DNREC's Air Pollution Regulations define "Air Pollution" to include contaminants which "unreasonably interfere[ ] with the enjoyment of life and property. . . ." Regulation No. 1. Regulation No. 19 prohibits emissions of odorous air contaminants which constitute air pollution. The Board has rejected Raytheon's proposed standard of 7 D/T to show an objectionable odor. Rather, the Board adopts the more flexible unreasonable interference stan-

dard in the Regulations and finds that past odors at the DRP have violated this standard.

Regulation No. 1 to which the Board refers states:

AIR POLLUTION: The presence in the outdoor atmosphere of one or more air contaminants in sufficient quantities and of such characteristics and duration as to be injurious to human, plant, or animal life or to property or which unreasonably interferes with the enjoyment of life and property within the jurisdiction of the State, excluding all aspects of employer-employee relationships as to health and safety hazards.

The Board referred to Regulation No. 19, which states:

Section 1—General Provisions

1.1 The purpose of this Regulation is to control odorous air contaminants which significantly effect the citizens of the State outside the boundaries of the air contaminant source.

1.2 Methods for determining a condition of air pollution due to an odorous air contaminant may include, but are not limited to, scentometer tests, air quality monitoring, and affidavits from affected citizens and investigators.

Section 2—Requirements

2.1 No person shall cause or allow the emission of an odorous air contaminant such as to cause a condition of air pollution.

The definition of air pollution contains the phrase "unreasonably interferes with the enjoyment of life and property". This phrase has been held to be a codification of common law nuisance. *James Julian, Inc. v. Wilson*, Del.Ch., C.A. No. 8593, C.A. No. 921–K, 1986 WL 10501 (consolidated), Jacobs, V.C. (September 22, 1986) at n. 3.

In general, whether a use of property amounts to a nuisance depends on its "reasonableness" considering all of the circumstances. Restatement, Torts (Second) Sec. 822 (1979). Typically, "reasonableness" is determined by balancing the seriousness of the inconvenience, annoyance or harm pro-

duced by the complained of use against the fitness or utility of the use causing the harm. The test of reasonableness is an objective one in the sense that the test is not whether the parties themselves would consider a use reasonable or unreasonable, but whether an ordinary person, "looking at the whole situation impartially and objectively," Restatement, Torts (Second) Sec. 826, Comment c (1979), would regard it as reasonable. [Footnote omitted.]

*Fenton v. Longwill,* Del.Ch., C.A. No. 5836, 1987 WL 19559, Allen, C. (November 5, 1987), slip op. at 8–9.

There was testimony that residents living near the DRP plant suffered various ailments which they attributed to the odor from DRP. Although none of these situations appeared injurious to human life, the residents expressed that there has been a substantial interference and disruption of their lives due to the odors. The odor has caused residents to close their windows as the odor permeates clothing and draperies. Residents also testified that the odor has limited outdoor activities such as yard work and cooking outdoors. The testimony from the residents implicates the second part of Regulation No. 1 in its definition of air pollution—that part codifying common law nuisance.

The Board is inconsistent in its handling of this test. It states at one point:

4. The testimony from nearby residents showed that the odors from the DRP caused a nuisance, although the nuisance was not present everyday. DNREC received numerous calls over time from nearby property owners who complained about the odors. See DNREC Exhibit No. 1. This exhibit may not be entirely accurate, but it evidences a substantial odor problem. Outdoor activities, such as swimming, parties, and cookouts, have been seriously affected by these odors.

Board Findings of Fact. The Board found that property values would benefit from the elimination of the odor problem. *Id.* at 7. It found that since the sewage sludge 6–processing module had been closed, twice the amount of sludge material was being put in landfills.

In its Conclusion of Law, the Board stated that the threat of an odor problem is less than the threat posed by the discharge of hazardous or toxic wastes. Yet, the Board acknowledged "substantial questions" about DRP's economic viability. It offered that DRP performs a public service. The Board then went on to say:

The social utility of the DRP, or whether its results justify its high cost, is certainly an issue which should be addressed. However, the Board is not the appropriate entity to resolve this issue; this is a permit appeal.

Board Conclusions of Law.

■ The Board erred in not considering "utility". The record is overwhelming regarding the large number of odor complaints DNREC received, 851 between 1985 and 1993. DRP has been convicted 44 times of odor pollution violations. As a result of the cessation of certain activities involving sludge, various governmental utilities previously using DRP have saved money.

There is an undisputed history of odor problems at DRP. It cannot be argued that these problems have unreasonably interfered with the enjoyment by residents of their homes and properties. There can be little dispute, and the Board acknowledged, that DRP has not been accurate in its prior predictions and efforts to control the odor problem. The current proposal is based on a model, not an actual, successful operating plant with similar control needs and equipment such as that DRP proposed.

Further, the Board's incomplete, at best, analysis of utility, or in other words, not weighing the unreasonableness of the odor and history of violations against an unproven model, was error. This is not to say models cannot be presented and form the basis for decisions in air pollution or any other disputes, but the proposed model here must be viewed in the total historical context of DRP, including its prior inaccurate predictions. It must also be viewed in the context of the procedural posture and statutory roles governing the Board and the Secretary.

Simply put, the Board put undue weight on the testimony of DRP's expert, which it alone heard, to reach the incorrect conclusion that

the Secretary had no evidence to deny the permit based upon the record before the Secretary and DNREC's additional evidence presented to the Board.

### CONCLUSION

The Board properly denied DNREC's motion *in limine* to exclude the testimony of Dr. Turner. However, while the acceptance of additional testimony was proper, the additional evidence was insufficient to reverse the Secretary's denial of the construction permit. Therefore, the Board not only erroneously disregarded the Secretary's technical expertise in environmental issues but it erred in reversing the Secretary's ultimate denial of the construction permit.

Finally, the Board erred as a matter of law in refusing to consider the utility of DRP's proposed building additions. DNREC regulations clearly state that issuance of a permit depends on whether the resulting emissions will not cause a nuisance. Thus, the utility of the proposed project is an essential component in determining whether or not the addition will cause a nuisance and whether the permit is warranted. While the Secretary considered these factors, the Board did not.

Based on the foregoing, the decision of the Environmental Appeals Board reversing Secretary Christophe A.G. Tulou's denial of a construction permit filed by Raytheon Service Company is **REVERSED** and **REMANDED.**