IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DELAWARE SOLID WASTE AUTHORITY; GREGGO & FERRARA, INC.; and CONTRACTORS HAULING, LLC, | § § § § § | Nos. 81, 2020 and 88, 2020 |
| | § | CONSOLIDATED |
| Appellees Below, Appellants/Cross-Appellees | § § § | Court Below – Superior Court of the State of Delaware |
| v. | § § | C.A. No. K19A-05-002 |
| DELAWARE DEPARTMENT OF NATURAL RESOURCES AND ENVIRONMENTAL CONTROL, | § § § § § | |
| Appellant Below, Appellee/Cross-Appellant. | § § | |

Submitted: January 13, 2021
Decided: April 9, 2021

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR,** and **MONTGOMERY-REEVES**, Justices, constituting the Court *en Banc*.

Upon appeal from the Superior Court. **AFFIRMED IN PART, REVERSED IN PART, and REMANDED.**

Michael W. Teichman, Esquire (argued), Elio Battista, Jr., Esquire, Kyle F. Dunkle, Esquire, PARKOWSKI, GUERKE & SWAYZE, P.A., Wilmington, Delaware; *for Appellant/Cross-Appellee Delaware Solid Waste Authority.*

Jeffery M. Weiner, Esquire (argued), Wilmington, Delaware; *for Appellants/Cross-Appellees Greggo & Ferrara Inc., and Contractors Hauling, LLC.*

William J. Kassab, Esquire (argued), DEPARTMENT OF JUSTICE, New Castle, Delaware; *for Appellee/Cross-Appellant Delaware Department of Natural Resources and Environmental Control.*

**MONTGOMERY-REEVES**, Justice:

On July 25, 2018, an enforcement officer working for the Department of Natural Resources and Environmental Control ("DNREC" or the "Department") pulled over a truck hauling municipal solid waste from the Pine Tree Corners Transfer Station (the "Pine Tree Station"). The truck's owner and operator, Contractors Hauling, LLC ("Contractors Hauling"), did not have a valid permit to transport solid waste, violating Delaware law. The Department subsequently determined that on numerous occasions between September 2017 and July 2018, vehicles belonging to Contractors Hauling transported solid waste from the Pine Tree Station without a valid permit.

The Delaware Solid Waste Authority ("DSWA" or the "Authority") operates the Pine Tree Station subject to a Department-issued permit. In 2017, the Authority transferred operations of the station to a subcontractor, Greggo & Ferrera, Inc. ("G&F"). Later that year—and apparently without the Authority's knowledge—G&F began using vehicles owned and operated by its affiliate entity, Contractors Hauling, to transport waste from the transfer station to waste disposal facilities.

The Department determined that each of the three entities—the Authority, G&F, and Contractors Hauling—violated various requirements related to solid waste, and the Department assessed civil penalties and costs. The Department faulted the Authority for failing to ensure that all transporters had valid permits and for failing to provide a complete

2

list of transporters; G&F for subcontracting with an entity that did not have a valid transporter permit; and Contractors Hauling for transporting waste without a valid permit.

Each entity filed a timely appeal with the Environmental Appeals Board (the "Board"). The Board reversed the Department's assessments of fines and penalties. Regarding the Authority, the Board held that the Department could not impose a permit condition requiring that the Authority ensure all transporters have valid permits and that the Authority could not be held liable for failing to disclose information of which it was unaware. Regarding G&F and Contractors Hauling, the Board agreed that the entities committed violations but found no penalty was appropriate because those violations were not culpable and did not harm the environment.

The Department appealed to the Superior Court. The court held: (i) the Department had the authority to impose the permit condition, but it was unconstitutionally vague; (ii) the Authority was strictly liable for failing to provide a complete list of transporters; (iii) the Board erred by setting aside the penalties assessed against G&F and Contractors Hauling; and (iv) the Secretary's cost assessments were not before the Board.

Each of the parties appeals the Superior Court's decision. The Department argues that the permit condition is not void for vagueness and that the Board applied the wrong standard of review to the Department's determinations regarding violations and penalties. The Authority argues that the permit condition was unlawful and that the Authority cannot be held strictly liable for failing to report information it did not know. G&F and Contractors

3

Hauling argue that the Superior Court should not have reversed the Board's determination setting aside the penalties that the Department assessed.

Having reviewed the parties' briefs and record on appeal, and after oral argument, this Court holds: (i) the Superior Court and the Board erred by holding that the permit condition is unlawful; (ii) the Superior Court properly held that the Authority is strictly liable for failing to provide a complete list of transporters; (iii) the Superior Court erred by overturning the Board's determination that no penalty should be assessed against G&F and Contractors Hauling; and (iv) the Superior Court properly held that the Secretary's ability to recover costs was not before the Board. Accordingly, this Court affirms-in-part, reverses-in-part, and remands-in-part the Superior Court's January 29, 2020 decision. On remand, the Superior Court shall remand this appeal to the Board to determine whether the record supports the penalty that the Department assessed against the Authority.

## I.    RELEVANT FACTS AND PROCEDURAL BACKGROUND

### A.    The Parties and Relevant Non-Parties

Appellant and Cross-Appellee the Delaware Solid Waste Authority is a quasi-governmental entity established under 7 *Del. C.* § 6403. Among other things, the Authority operates the Pine Tree Corners Transfer Station (the "Pine Tree Station") and the Central Waste Management Center, a landfill near Sandtown, Delaware (the "Sandtown Landfill").[1]

---

[1] *Del. Dep't of Nat. Res. & Envtl. Control v. Del. Solid Waste Auth.*, 2020 WL 495210, at *1 (Del. Super. Ct. Jan. 29, 2020).

Michael D. Parkowski is the Authority's Chief of Business and Governmental Services.[2]

Justin Wagner is the Authority's Facility Manager for the Pine Tree Station and Sandtown Landfill.[3]

Fred Oehler is the Authority's Supervisor of Compliance.[4]

Appellant and Cross-Appellee Greggo & Ferrera, Inc. is a contractor that the Authority hired to operate and maintain the Pine Tree Station.[5]

Charles Howarth is the G&F Supervisor of the Pine Tree Station.[6]

Appellant and Cross-Appellee Contractors Hauling LLC is an affiliate entity owned and operated by the same family that owns and operates G&F.[7] When referring to G&F and Contractors Hauling collectively, this opinion uses the term "G&F Group."

Appellee and Cross-Appellant the Delaware Department of Natural Resources and Environmental Control is the administrative agency tasked with enforcing Delaware's environmental laws and regulations, including those governing solid waste.[8] The

---

[2] App. to DSWA Opening Br. 69 (hereafter "A_").
[3] A88-89.
[4] A78-79.
[5] *See* A75-76.
[6] A152.
[7] *See* A167; App. to DNREC Answering Br. 136 (hereafter "B_").
[8] *See, e.g.*, 7 *Del. C.* § 6003.

authorizing statutes put the Department's Secretary (the "Secretary") in charge of enforcement.[9]

### B. The Pine Tree Station and Sandtown Landfill

The Authority operates three waste transfer stations in Delaware, including the Pine Tree Station.[10] Transfer stations provide a local destination for solid waste, removing the need for customers to travel to a centralized facility, such as a landfill, for proper waste disposal.[11] Solid waste can remain at a transfer station for a maximum of 72 hours, unless the Department makes a written exception.[12] Arranging to timely haul solid waste to a disposal facility is therefore an integral part of operating a transfer station. Delaware law requires that all three links in this chain—transfer stations, transporters, and disposal facilities—obtain permits issued by the Department.[13]

The Authority operates the Pine Tree Station subject to Permit SW-06/04 (the "Pine Tree Station Permit").[14] The Pine Tree Station Permit has two provisions relevant to this appeal. First, Condition II.I.2 of the Pine Tree Station Permit imposes four requirements related to transporter permits:

> All vehicles transporting waste from the Transfer Station
> shall have a valid solid waste transporters permit issued by the

---

[9] *See, e.g.*, *Del. Dep't of Nat. Res. & Envtl. Control v. McGinnis Auto & Mobile Home Salvage, LLC*, 225 A.3d 1251, 1254 (Del. 2020) ("DNREC's Secretary is responsible for enforcing the provisions of the Act." (citing 7 *Del. C.* §§ 6001(c)(3), 6005(a))).

[10] *Del. Dep't of Nat. Res.*, 2020 WL 495210, at *1.

[11] *Id.*

[12] 7 *Del. Admin. C.* § 1301-10-5.2.1.

[13] *See* 7 *Del. C.* § 6003(a)(4), (b)(5).

[14] A320.

6

DNREC. In their contracts with transporters hauling waste from the Transfer Station, the DSWA shall stipulate that the contractor maintain a valid solid waste transporter permit issued by the DNREC. DSWA shall investigate and determine the current validity of the permit if it has reason to suspect a permit is not valid. All vehicles transporting waste collected by the HHW collection program from the Transfer Station shall have a valid hazardous waste transporters permit issued by the DNREC.[15]

Second, Condition III.B.2 of the Pine Tree Station Permit requires that the Authority submit an annual report to the Department in March of each year describing various aspects of the station's operations, including "[a] list of transporters that hauled waste to and from the facility during the year covered by the report."[16]

In addition to the transfer stations, the Authority operates the Sandtown Landfill subject to Permit SW-10/01 (the "Sandtown Landfill Permit").[17] The Sandtown Landfill Permit contains a reporting condition that requires the Authority to submit an annual report in April of each year describing various aspects of landfill's operations, including "a list of transporters that hauled waste to or from the facility."[18] The Court refers to the reporting conditions included in the Pine Tree Station Permit and the Sandtown Landfill Permit collectively as the "Reporting Conditions."

---

[15] A324.
[16] A328.
[17] *Del. Dep't of Nat. Res.*, 2020 WL 495210, at *1; A333.
[18] *See* A354, at § V.B.3.

## C. The Authority Learns that Contractors Hauling Trucks Were Transporting Solid Waste Without Permits

In 2017, the Authority shifted the duties of operating and maintaining the Pine Tree Station to G&F, a subcontractor.[19] G&F's responsibilities included timely transporting solid waste from the Pine Tree Station to centralized disposal facilities, such as the Sandtown Landfill.[20] The contract between the Authority and G&F provides, "CONTRACTOR will ensure that all vehicles transporting waste from [the Pine Tree Station] shall have a valid solid waste transporter permit issued by DNREC."[21] As part of the vetting process, G&F submitted a copy of its permit to transport solid waste.[22]

In June 2018, the Authority's Chief of Business and Governmental Services, Michael D. Parkowski, received a tip from a retired Department employee that a truck appeared to have hauled waste from the Pine Tree Station without a transporter permit sticker.[23] Department regulations require that vehicles transporting solid waste obtain a permit[24] and that vehicles transporting solid waste display a conspicuous sticker providing information about the vehicle's permit.[25]

---

[19] *See, e.g.*, A73, at 53:6-14.
[20] *See generally* A73-74.
[21] A374, at § 15.0.
[22] A75, at 55:15-18.
[23] *See, e.g.*, A78, at 58:10-59-6.
[24] 7 *Del. Admin. C.* § 1301-7.1.5 ("Each vehicle used to transport solid waste and required to have a transporter's permit must carry a copy of the permit in the vehicle. The permit must be presented upon request to any law enforcement officer or any representative of the Department.").
[25] *See, e.g.*, *id.* § 1301-7.2.3.6 ("The Transporters' permit number shall be prominently displayed on both sides and the rear of the vehicle in figures at least three inches high and of a color that contrasts with the color of the vehicle.").

Parkowski thought that G&F may have "forgot[ten] to put the stickers on the truck," but he decided to ask the Authority's Supervisor of Compliance, Fred Oehler, to investigate.[26] Oehler reported back that G&F appeared to be using trucks operating under the name of Contractors Hauling, an affiliate entity to G&F.[27] Oehler also confirmed that the trucks did not have permit stickers. Perhaps assuming that the Contractors Hauling trucks were owned by G&F and could operate under G&F's permit, Parkowski told Oehler "they better label the trucks with the stickers because they have to display that."[28]

One week later, the G&F employee in charge of managing the Pine Tree Station, Charles Howarth, contacted the Authority's Facility Manager for the Pine Tree Station and Sandtown Landfill, Justin Wagner.[29] Howarth told Wagner that Contractors Hauling did not have a permit to transport waste and that G&F had tried and failed to contact the Department regarding whether Contractors Hauling's trucks could transport waste under G&F's permit.[30] Howarth also told Wagner that Contractors Hauling had submitted an application for its own permit to transport solid waste.[31] Wagner did not tell Howarth that G&F was not allowed to use the Contractors Hauling trucks because he thought that restriction was "clearly stated in the contract" between the Authority and G&F.[32]

---

[26] A79, at 59:2-6.
[27] *Id.* at 59:9-15.
[28] *Id.* at 59:12-15.
[29] A91-92, at 71:24-72:9.
[30] *Id.*
[31] *Id.*
[32] A92, at 72:10-15.

Despite these red flags, "[n]o one at [the Authority] told G&F or [Contractors Hauling] to stop transporting waste until they resolved the permitting issue,"[33] and the Contractors Hauling trucks continued to transport waste from the Pine Tree Station.[34] The Authority also failed to update the transporter lists that it had provided the Department earlier that year as part of its mandatory annual reports, which did not disclose that Contractors Hauling had transported waste from the Pine Tree Station to the Sandtown Landfill.[35]

D.      **The Department Discovers that Contractors Hauling Transported Waste from the Pine Tree Station Without a Permit and Assesses Penalties**

On July 25, 2018, approximately six weeks after the Authority first learned that the Contractors Hauling trucks were hauling waste from the Pine Tree Station without permits, a Department officer stopped a truck departing the Pine Tree Station displaying a Contractors Hauling logo.[36] The officer stopped the truck because he could not locate a permit sticker, which should have been conspicuously displayed on the side and back of the vehicle.[37] The truck's driver was unable to provide the officer with a copy of the vehicle's transporter permit.[38] The officer did not observe any other violations related to hauling waste.[39]

---

[33] A6.
[34] *See, e.g.*, A291-92.
[35] *See, e.g.*, A291.
[36] A7.
[37] *Id.*
[38] *Id.*
[39] *Id.*

After learning of the stop, G&F arranged to have a third-party transport waste from the Pine Tree Station until Contractors Hauling could obtain a valid transporter permit.[40] The Department eventually determined that Contractors Hauling's trucks transported waste from the Pine Tree Station on 334 calendar days from September 2017 to July 2018, accounting for more than 3,000 trips.[41] Contractors Hauling's trucks did not have valid permits to make any of these trips.

In November 2018, the Department's Secretary issued three Secretary's Orders assessing administrative penalties and costs against the Authority, G&F, and Contractors Hauling (collectively, the "Secretary's Orders").[42] The Secretary's Order issued to the Authority (Order No. 2018-WH-0066) determined that the Authority violated Condition II.I.2 of the Pine Tree Station Permit because "DSWA[] fail[ed] over the course of several months to ensure that all vehicles that transfer waste from its [Pine Tree Station] possess[ed] a valid Delaware solid waste transporter permit."[43] The order also determined that the Authority violated the Reporting Conditions by "not not[ing] in its 2017 annual report that Contractors Hauling, LLC also transported [municipal solid waste] from [the Pine Tree Station] to [the Sandtown Landfill] at any point in 2017."[44] The order assessed the

---

[40] A166.
[41] A290.
[42] *See* A288; A304; A312.
[43] A288, A292.
[44] A293.

Authority with an $18,174.80 penalty under 7 *Del. C.* § 6005(b)(3) and $1,198.80 in costs under § 6005(c).[45]

The Secretary's Order issued to G&F (Order No. 2018-WH-0067) determined that G&F violated 7 *Del. Admin. C.* § 1301-7.1.7 by subcontracting with Contractors Hauling, which did not have a valid permit, to transport solid waste from September 2017 to July 25, 2018.[46] Under § 1301-7.1.7, "Permitted solid waste transporters shall not use agents or subcontractors who do not hold permits for transporting solid waste." The order assessed G&F with a $14,800.00 penalty under 7 *Del. C.* § 6005(b)(3) and $2,126.48 in costs pursuant to § 6005(c).[47]

The Secretary's Order issued to Contractors Hauling (Order No. 2018-WH-0068) determined that Contractors Hauling violated 7 *Del. C.* § 6003(a)(4) and 7 *Del. Admin. C.* § 1301-7.1.1 by transporting solid waste without a permit.[48] Under § 6003(a)(4), "No person shall, without first having obtained a permit from the Secretary, undertake any activity . . . which may cause or contribute to the collection, *transportation*, storage, possessing, or disposal of solid wastes . . . ."[49] Similarly, § 1301-7.1.1 provides, "No person shall transport solid waste, without first having obtained a permit from the Department . . . ." The order

---

[45] A293-94.

[46] A304-06.

[47] *Id.*

[48] A312, A314.

[49] (emphasis added).

assessed Contractors Hauling with a $16,630.00 penalty pursuant to § 6005(b)(3) and $2,126.48 in costs pursuant to § 6005(c).[50]

### E. The Environmental Appeals Board Reverses the Secretary's Assessments of Penalties and Costs

In December 2018, the Authority, G&F, and Contractors Hauling (collectively, the "Appellants") each filed a timely notice of appeal with the Board, challenging the Secretary's Orders under 7 *Del. C.* § 6008.[51] The Appellants did not request a public hearing with the Secretary before filing their appeal.

The Board held an evidentiary hearing in February 2019, the first hearing related to the Secretary's Orders.[52] In May 2019, the Board issued a written decision and final order, which reversed all of the penalties and costs that the Secretary assessed.[53] Regarding the Authority, the Board held that Condition II.I.2 of the Pine Tree Station Permit was unlawful because "DSWA has no authority to monitor or enforce DNREC permits and that DNREC has no authority to impose such a condition."[54] The Board also determined that the Authority did not violate the Reporting Conditions because the Authority "could not report that G&F was using vehicles owned by an affiliate in [the Authority's] Annual Report because [the Authority] had no knowledge until after the Report was filed."[55] The Board also "reject[ed]

---

[50] A314.

[51] A3-4.

[52] *See* A20.

[53] A2.

[54] A11.

[55] *Id.*

13

DNREC's contention that [the Board] lack[ed] jurisdiction to address the assessment of cost recovery in a DNREC enforcement action."[56] Thus, the "Board f[ound] no basis for the imposition of monetary penalties or cost recovery against [the Authority]."[57]

Regarding G&F, the Board agreed with the Secretary's determination that G&F violated 7 *Del. Admin. C.* § 1301-7.1.7 by subcontracting with Contractors Hauling to transport solid waste without the required permits.[58] Nonetheless, the Board determined that "no penalty or cost recovery [was] appropriate" because "such violation was the result of understandable oversight," and "no environmental harm or damage occurred."[59]

The Board reached a similar conclusion regarding Contractors Hauling. The Board agreed with the Secretary's determination that Contractors Hauling violated the applicable regulatory and statutory requirements by transporting solid waste without the required permits,[60] but the Board "conclude[d] that no penalty or cost recovery [was] appropriate" because "such violation was the result of an innocent lack of communication between G&F and [Contractors Hauling]," and "no environment[al] harm or damage occurred."[61]

---

[56] A12.
[57] *Id.*
[58] *Id.*
[59] *Id.*
[60] A12-13.
[61] A13.

**F.      The Superior Court Affirms-in-Part and Reverses-in-Part the Board's Decision and Remands**

The Department timely appealed the Board's decision to the Superior Court under 7 *Del. C.* § 6009.[62]  In January 2020, the Superior Court issued a memorandum opinion and order holding:

i.      the Secretary's cost assessments were not properly before the Board because the Secretary had not submitted a detailed billing of costs and was not formally seeking costs from the Appellants;

ii.      the Secretary had the power to impose Condition II.I.2, but the condition was void for vagueness;

iii.      the Board had authority to review the Secretary's assessments of penalties;

iv.      the Board erred by overturning the Secretary's determination that the Authority was liable for violating the Reporting Conditions because they are strict-liability conditions; and

v.      the Board's determination that the G&F Group should not be assessed penalties "was not well-considered."[63]

Thus, the Superior Court:  (i) affirmed the Board's determination that Condition II.I.2 was invalid; (ii) reversed the Board's determination that the Authority did not violate the Reporting Conditions; (iii) reversed the Board's determination that no administrative penalties should be assessed against the G&F Group; and (iv) remanded the appeal to the Board to consider the appropriate penalties.[64]

---

[62] *Del. Dep't of Nat. Res.*, 2020 WL 495210, at *3.
[63] *Id.* at *5-11.
[64] *Id.*

15

The Department, the Authority, G&F, and Contractors Hauling have each filed a timely notice of appeal challenging the Superior Court's order.

## II.    STANDARD OF REVIEW

The Court reviews *de novo* questions of law, including questions of statutory interpretation and constitutional law.[65]   When "review[ing] a Superior Court ruling that, in turn, . . . reviewed the ruling of an administrative agency," this Court examines the agency's decision directly.[66]   Thus, "[o]ur review of the [Board's] decision matches that of the Superior Court—whether the decision is supported by substantial evidence and is free from legal error."[67]   "Substantial evidence is that which a reasonable mind might accept as adequate to support a conclusion.   It is more than a 'mere scintilla but less than a preponderance of the evidence.'"[68]

---

[65] *See, e.g.*, *Salzberg v. Sciabacucchi*, 227 A.3d 102, 112 (Del. 2020) ("Statutory interpretation is a question of law, which we review *de novo*." (citing *Corvel Corp. v. Homeland Ins. Co. of N.Y.*, 112 A.3d 863, 868 (Del. 2015))); *Cohen v. State ex rel. Stewart*, 89 A.3d 65, 86 (Del. 2014) ("This Court reviews claims of violations of constitutional rights *de novo*."  (citing *Cooke v. State*, 977 A.2d 803, 840 (Del. 2009))); *Del. Dep't Nat. Res. & Envt'l Control v. Sussex C'ty*, 34 A.3d 1087, 1090 (Del. 2011) ("Questions of law are reviewed *de novo*.  Statutory interpretation is a question of law." (citation omitted)).

[66] *United Parcel Serv. v. Tibbits*, 93 A.3d 655, 2014 WL 2711302, at *2 (TABLE) (citing *Pub. Water Supply Co. v. DiPasquale*, 735 A.2d 378, 380 (Del. 1999)).

[67] *Keep Our Wells Clean v. Del. Dep't Nat. Res. & Envtl. Control*, 243 A.3d 441, 445-46 (Del. 2020) (citing *Del. Dep't of Nat. Res. & Envtl. Control v. McGinnis Auto & Mobile Home Salvage*, 225 A.3d 1251, 1254 (Del. 2020)); *see also Coastal Barge Corp. v. Coastal Zone Indus. Control Bd.*, 492 A.2d 1242, 1244 (Del. 1985) ("[R]eversal of the Board is warranted if it abused its discretion, committed an error of law, or made findings of fact unsupported by substantial evidence." (citing *Kreshtool v. Delmarva Power & Light Co.*, 310 A.2d 649, 652 (Del. 1973))).

[68] *Keep Our Wells Clean*, 243 A.3d at 446 (quoting *Prunckun v. Dep't of Health & Soc. Servs.*, 201 A.3d 525, 540 (Del. 2019); *Powell v. OTAC, Inc.*, 223 A.3d 864, 870 (Del. 2019)).

## III. ANALYSIS

This appeal asks the Court to decide four issues. First, whether Permit Condition II.I.2 is lawful. Second, whether the Superior Court erred by reversing the Board's determination that DSWA complied with the Reporting Conditions. Third, whether the Superior Court erred by reversing the Board's determination that the G&F Group should not be assessed civil fines despite committing violations. Fourth, whether the Superior Court erred by holding that the Secretary's cost assessments were not properly before the Board. The Court addresses each issue in turn.

### A. Condition II.I.2 of the Pine Tree Station Permit Is Lawful

The Authority operates the Pine Tree Station subject to the Pine Tree Station Permit. Condition II.I.2 of the permit states,

> All vehicles transporting waste from the Transfer Station shall have a valid solid waste transporters permit issued by the DNREC. In their contracts with transporters hauling waste from the Transfer Station, the DSWA shall stipulate that the contractor maintain a valid solid waste transporter permit issued by the DNREC. DSWA shall investigate and determine the current validity of the permit if it has reason to suspect a permit is not valid. All vehicles transporting waste collected by the HHW collection program from the Transfer Station shall have a valid hazardous waste transporters permit issued by the DNREC.[69]

The Authority argues that Condition II.I.2 is unlawful for two primary reasons. First, the Secretary does not have the power to impose Condition II.I.2 because it imposes

---

[69] A324.

17

compliance requirements that lack a basis in duly promulgated regulations.[70]   Second, Condition II.I.2 is unconstitutionally vague because it fails to provide reasonable notice of the applicable standard of conduct.[71]

### 1.     The Secretary had the power to impose Condition II.I.2

Under 7 *Del. C.* § 6003(c), the Secretary has the power to "grant or deny a permit" to collect, transport, store, or process solid waste "in accordance with duly promulgated regulations."   Relying on this Court's opinion in *Formosa Plastics Corp. v. Wilson*, the Superior Court held that § 6003 grants the Secretary the power to impose "reasonable permit conditions . . . even if they do not have explicit antecedents in the applicable regulations."[72] Accordingly, the Court held that Condition II.I.2 could be lawful even if it lacked an explicit regulatory antecedent.[73]

The Authority argues that the Superior Court erred because the Secretary has no power to impose a permit condition, reasonable or unreasonable, unless the Department previously enacted a regulation containing "specific provisions" authorizing that "kind" of permit condition.[74]   Relying on this statutory construction, the Authority argues that Condition II.I.2 is invalid because it contains two permit conditions that lack regulatory

---

[70] DSWA Opening Br. 14-19.
[71] *Id.* at 20-23.
[72] *Del. Dep't of Nat. Res.*, 2020 WL 495210, at *6 (citing *Formosa Plastics Corp. v. Wilson*, 504 A.2d 1083, 1088-89 (Del. 1986)).
[73] *Id.*
[74] DSWA Reply Br. 24.

18

antecedents.  First, Condition II.I.2 requires that "[a]ll vehicles transporting waste from the Transfer Station . . . have a valid solid waste transporters permit . . . " (the "Ensure Condition").[75]  According to the Authority, the Ensure Condition is unlawful because the Department has not enacted regulations "that require a transfer station operator to 'ensure' that a third-party waste transporter has a valid transporter's permit."[76]  Instead, existing regulations only hold transporters responsible for obtaining permits to haul solid waste.[77]

Second, Condition II.I.2 requires that "DSWA . . . investigate and determine the current validity of a permit if [DSWA] has reason to suspect a permit is not valid" (the "Investigate and Determine Condition").[78]  According to the Authority, the Investigate and Determine Condition is unlawful because "[n]o current regulation allows DNREC to require permittees to 'investigate and determine' the validity of permits DNREC issues to other parties," or "allows DNREC to subdelegate its . . . investigatory and enforcement powers."[79]

The Delaware General Assembly enacted the Environmental Control Act to ensure "proper 'solid waste storage, collection, transportation and disposal.'"[80]  The Secretary is responsible for enforcing the provisions of the Act, including the requirement that transfer stations, transporters, and disposal facilities obtain permits to collect, transport, store, and

---

[75] A324.

[76] DSWA Reply Br. 22 (citing 7 *Del. Admin. C.* § 1301-10.0).

[77] *Id.*

[78] A324.

[79] DSWA Opening Br. 15.

[80] *Del. Dep't Nat. Res. & Envtl. Control v. McGinnis Auto & Mobile Home Salvage, LLC*, 225 A.3d 1251, 1254 (Del. 2020) (quoting 7 *Del. C.* § 6001(c)(6)).

dispose of solid waste.[81]   The statute specifically instructs courts to adopt a liberal construction, providing that "[t]his chapter, being necessary for the welfare of the State and its inhabitants, shall be liberally construed in order to preserve the land, air and water resources of the State."[82]

Central to this statutory scheme is the prohibition that "[n]o person shall, without first having obtained a permit from the Secretary, undertake any activity . . . [i]n a way which may cause or contribute to the collection, *transportation*, storage, processing, or disposal of solid wastes . . . ."[83]   The Department has promulgated numerous regulatory requirements implementing this statutory scheme,[84] including the requirements that:

i.   "no person shall transport solid waste, without first having obtained a permit from the Department";[85]

ii.   "[e]ach transporter that picks up and/or deposits solid waste in Delaware shall submit an annual report . . . summarizing information from the preceding calendar year," including the "amounts of solid waste . . . delivered to each destination";[86]

iii.   vehicles transporting solid waste must "prominently display[]" the transporter's "name" and "permit number";[87]

---

[81] *Id.* (citing 7 *Del. C.* § 6005(a)).
[82] 7 *Del. C.* § 6020.
[83] *Id.* § 6003(a)(4) (emphasis added).
[84] *See generally* 7 *Del. Admin. C.* § 1301-7 (collecting certain regulatory requirements applicable to transporters); *id.* § 1301-10 (collecting certain regulatory requirements applicable to transfer stations).
[85] *Id.* § 1301-7.1.1.
[86] *Id.* § 1301-7.2.7.1.2.
[87] *Id.* § 1301-7.2.3.5 to 7.2.3.6.

iv. "[s]olid waste shall not remain at [a] transfer station for more than 72 hours without the written approval of the Department";[88]

v. "[a]ll solid waste accepted at the transfer station must, upon leaving the transfer station, be delivered to a processing or disposal facility authorized by the Department . . . to accept that type of waste";[89]

vi. transfer station owners and operators must keep "[a] record of the solid waste commercial haulers . . . using the facility and the type and weight or volume of solid waste delivered by each hauler to the transfer station each day," along with the "[d]estination of the solid waste;"[90] and

vii. transfer station "permitee[s] shall submit to the Department on an annual basis a report summarizing the facility operations for the preceding calendar year" that includes "[a] complete list of commercial haulers that hauled waste to or from the facility during the year covered by the report."[91]

The above requirements work together to create a closed system for disposing of solid waste brought to transfer stations. Transfer stations must obtain a permit to operate,[92] arrange to transport solid waste to a Department-approved disposal facility within 72 hours of receipt,[93] and provide the Department with a "complete list" of transporters that hauled waste from the station.[94] Transporters must obtain permits to transport waste,[95] prominently display that permit information on vehicles,[96] and provide the Department with information

---

[88] *Id.* § 1301-10.5.2.1.
[89] *Id.* § 1301-10.5.2.2.
[90] *Id.* § 1301-10.5.3.1, 10.5.3.6.
[91] *Id.* § 1301-10.5.4.1.2.
[92] 7 *Del. C.* § 6003(a).
[93] 7 *Del. Admin. C.* § 1301-10.5.2.1 to 10.5.2.2.
[94] *Id.* § 1301-10.5.4.1.2.
[95] *Id.* § 1301-7.1.1.
[96] *Id.* § 1301-7.2.3.5 to 7.2.3.6.

regarding the waste's final destination.[97] Each link in the solid waste disposal chain must obtain a permit from the Department and provide the Department with information regarding how the solid waste was disposed.

According to the Authority, this closed system has a loophole: nothing requires transfer station operators to confirm that transporters have valid permits to haul solid waste from the transfer station.[98] Thus, the Ensure Condition and the Investigate and Determine Condition do not accord with regulations that the Department duly promulgated.[99]

As a threshold matter, the Court need not address the Investigate and Determine Condition to resolve this aspect of the Authority's appeal. The Secretary found that the Authority violated the Ensure Condition, not the Investigate and Determine Condition.[100] Thus, the Investigate and Determine Condition has no bearing on the conduct that the Secretary found violated Condition II.I.2, and whether the Investigate and Determine Condition is lawful poses an academic question that the Court need not address.

The question remains, however, whether the Secretary had the power to include the Ensure Condition in the Pine Tree Station Permit. 7 *Del. C.* § 6003(c) tasks the Secretary with granting or denying solid waste permits "in accordance with duly promulgated regulations." The leading case addressing the Secretary's permitting power is this Court's

---

[97] *Id.* § 1301-7.2.7.1.2.
[98] *See, e.g.*, DSWA Reply Br. 22.
[99] *See id.*; DSWA Opening Br. 15.
[100] A292-93 (the Secretary's Order); A324 (the Pine Tree Station Permit).

*Formosa* opinion. In *Formosa*, the Court held that the Secretary has the implied power to revoke permits even though § 6003(c) does not expressly grant the power of revocation.[101] In reaching that conclusion, the Court noted that "the authority to grant a license [generally] includes the power of revocation" and held that because "the terms of this statute are broad and plenary," the Court will "construe . . . the imposition of an emphatic duty" to confer "all necessary concomitant powers to give full force and effect to the clear legislative mandate of the Act."[102] The Court also found support in the Act's enforcement provisions, such as the Secretary's power under § 6005(b) to "impose an administrative penalty" upon "[w]hoever violates . . . any condition of a permit issued pursuant to § 6003 of this title."[103] The Court stated that these enforcement provisions evidence the Secretary's "unquestioned power to impose reasonable conditions upon issuance" of permits.[104]

Applying the reasoning in *Formosa*, the question before the Court is whether the Secretary's duty to issue permits "in accordance with duly promulgated regulations" implies the power to impose reasonable permit conditions that lack identical regulatory antecedents. Stated differently, is the power to impose reasonable permit conditions lacking identical regulatory antecedents a "necessary and concomitant power[] to give full force and effect to the clear legislative mandate of the Act"?[105]

---

[101] 504 A.2d at 1088-89.
[102] *Id.* at 1088 (citations omitted).
[103] *Id.* at 1089.
[104] *Id.*
[105] *Id.* at 1088.

The Court holds that the answer to these questions is "yes." The Secretary's duty to issue permits "in accordance with duly promulgated regulations" implies and requires the power to impose reasonable permit conditions that are consistent with existing regulations but lack identical regulatory antecedents. Denying this power would frustrate the Secretary's ability to develop an effective permitting program, as the Department would be forced to go through the formal rulemaking process each time it wanted to issue or amend a solid waste permit. This would make it difficult to develop a flexible permitting program reflecting permittee-specific risks and needs. It would also invite permittees to search for loopholes where formal regulations failed to expressly include all conditions necessary to implement the Department's duly promulgated regulations. Such a strict construction contradicts the Environmental Control Act's mandate that "[t]his chapter, being necessary for the welfare of the State and its inhabitants, shall be liberally construed"[106] and will not be adopted.

Applying the framework provided above, the next question is whether the Ensure Condition is consistent with the existing regulations that the Department has duly promulgated. The answer to this question too is "yes." As detailed above, the legislature tasked the Department with establishing a closed system requiring that each link in the solid waste disposal chain obtain permits from the Department.[107] The Department has enacted numerous regulations designed to establish this closed system,[108] including the requirements

---

[106] 7 *Del. C.* § 6020.

[107] *See* § 6003(a)(4).

[108] 7 *Del. Admin. C.* §§ 1301-7, 1301-10.

24

that transfer station operators arrange to transport solid waste to a Department-approved disposal facility within 72 hours of receipt[109] and that transfer station operators provide the Department with a "complete list" of transporters that hauled solid waste from the station.[110]

A permit condition requiring that a transfer station's operator ensure that "[a]ll vehicles transporting waste from the Transfer Station . . . have a valid solid waste transporters permit" is consistent with this scheme.[111]  The purpose of this requirement is to ensure, as the statute and regulations require,[112] that all transporters hauling waste from the transfer station have valid permits to transport solid waste.  This requirement is also consistent with a transfer station's duty to provide the Department with a "complete list" of transporters,[113] a requirement with the clear purpose of confirming that all of the transporters hauling waste from a transfer facility have valid transporter permits.  Thus, the Court holds that the Ensure Condition accords with duly promulgated regulations and is therefore lawful.

### 2.    Condition II.I.2 is not unconstitutionally vague

The Superior Court held that Condition II.I.2 was void for vagueness because the requirement that "DSWA ensure that all valid transporters have valid permits" was inconsistent with the requirement that "DSWA . . . 'investigate and determine' the validity of

---

[109] *Id.* § 1301-10.5.2.1 to 10.5.2.2.
[110] *Id.* § 1301-10.5.4.1.2.
[111] *See* A324.
[112] *See* 7 *Del. C.* § 6003(a)(4); 7 *Del. Admin. C.* § 1301-7.1.1.
[113] *See* 7 *Del. Admin. C.* § 1301-10.5.4.1.2.

25

a permit *only* if it has reason to suspect that the permit is invalid."[114]  The Court opined that

"if DSWA bore responsibility for permit invalidity *regardless* of any suspicions it might or

might not have," "[i]t would make no sense to require DSWA to investigate only if it

suspected permit invalidity."[115]   The court held that this inconsistency rendered

Condition II.I.2 unconstitutionally vague because a reasonable person might conclude that

the Authority would only be liable if it had reason to suspect that a transporter did not have

a valid permit.[116]   Thus, Condition II.I.2 failed to provide adequate notice that the

Department could hold the Authority strictly liable for failing to ensure that all transporters

had valid permits.[117]   For the same reason, the court concluded that the inconsistency

between these two permit conditions created a risk of arbitrary or erratic enforcement.[118]

In addition to the points the Superior Court's opinion raised, the Authority argues that

Condition II.I.2 is unconstitutionally vague because existing regulations do not provide any

"meaningful standards apprising DSWA of how it must discharge its 'investigate and

determine' obligation."[119]   Thus, the Authority reasons that the Department has failed to

promulgate regulations providing notice of the standard to which the Authority will be held.

The Authority also complains that the Department's interpretation of Condition II.I.2 has

---

[114] *Del. Dep't of Nat. Res.*, 2020 WL 495210, at *7.
[115] *Id.*
[116] *Id.* at *7-8.
[117] *Id.*
[118] *Id.*
[119] DSWA Reply Br. 25-26.

purportedly changed during the course of this litigation, from requiring that DSWA "investigate and determine" the validity of transporter permits to holding the Authority strictly liable for ensuring that all transporters had valid permits to haul solid waste.[120]

Under Delaware law, a statute or regulation can be void for vagueness in two different ways. First, "[a] statute is void for vagueness if 'it fails to give a person of ordinary intelligence fair notice that his contemplated behavior is forbidden by the statute . . . .'"[121] To prevail on a lack-of-notice vagueness claim, the claimant must show that the statute or rule "either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application."[122] Second, a statute or regulation can be void for vagueness if "it encourages arbitrary or erratic enforcement."[123] For example, "where the legislature fails to provide minimal guidance [for government law enforcement], a criminal statute may permit a 'standardless sweep that allows policeman, prosecutors, and juries to pursue their personal predilections.'"[124]

The Authority has brought an as-applied vagueness challenge to Condition II.I.2, which requires a showing that the permit condition is unconstitutionally vague as applied to

---

[120] *See id.* at 26.

[121] *Wien v. State*, 882 A.2d 183, 187 (Del. 2005) (quoting *State v. Baker*, 720 A.2d 1139, 1147-48 (Del. 1998)).

[122] *Crissman v. Del. Harness Racing Comm'n*, 791 A.2d 745, 747 (Del. 2002) (quoting *Globe Liquor Co. v. Four Roses Distillers Co.*, 281 A.2d 19, 22 (Del. 1971)).

[123] *Wein*, 882 A.2d at 187 (quotation omitted).

[124] *Robinson v. State*, 600 A.2d 356, 365 (Del. 1991) (alteration in original) (citations omitted) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)).

the Authority's conduct. When evaluating a vagueness claim, the pertinent question is whether the rule being challenged is so vague that a reasonable person cannot determine what conduct the rule prohibits.[125] Thus, the question before the Court is whether Condition II.I.2 is so vague that a reasonable person would be unable to recognize that the Authority could be held strictly liable if a transporter hauled waste without a valid permit.

Condition II.I.2 is not unconstitutionally vague as applied to the Authority's conduct. As noted above, the Secretary found that the Authority violated the Ensure Condition, which requires that all transporters hauling waste from the Pine Tree Station have valid permits.[126] Given the numerous statutory and regulatory provisions designed to confirm that all links in the solid waste disposal chain, including transporters, obtain permits from the Department,[127] a reasonable person in the Authority's position would understand what the Ensure Condition plainly requires: that the Authority ensure "[a]ll vehicles transporting waste from the Transfer Station shall have a valid solid waste transporters permit issued by the [Department]."[128]

To find ambiguity in this clear language, the Authority would need to infer that the Department would either tolerate the transportation of solid waste without a valid permit, or

---

[125] *See, e.g.*, *Wein*, 882 A.2d at 187.
[126] A292-93.
[127] *See supra*, Part III.A.1 (describing various regulations applicable to transfer stations); 7 *Del. Admin. C.* §§ 1301-7, 1301-10 (collecting certain regulatory requirements applicable to transporters and transfer stations, respectively).
[128] A324.

that the Department chose not to require the Authority to determine whether the transporters hauling waste from its own facility had valid permits. Neither inference is reasonable. The first inference contradicts the Ensure Condition's plain language. The second inference assumes that the Department would not ask the party in the best position to monitor the Pine Tree Station's operations, the Authority, to determine whether the transporters invited to the station had valid permits to transport solid waste. And both inferences are inconsistent with the underlying statutory and regulatory scheme, which relies on a universal permitting process to monitor and control solid waste disposal. Thus, the Court holds that the Ensure Condition provides adequate notice that the Authority was strictly liable for ensuring that all transporters hauling solid waste from the Pine Tree Station had valid transporter permits.

The Superior Court's opinion focused heavily on the interplay between the Ensure Condition and the Investigate and Determine Condition.[129] This Court agrees with the Superior Court's assessment that Condition II.I.2 is poorly written and *could* cause a person to infer that the Authority would only be liable where it had some reason to suspect that a transporter's permit was invalid. Nonetheless, given the broader statutory and regulatory scheme applicable to solid waste, a reasonable person would understand that the Ensure Condition holds the Authority strictly liable for ensuring that all transporters hauling waste from the Pine Tree Station have valid permits.

---

[129] *See Del. Dep't of Nat. Res.*, 2020 WL 495210, at *7-8.

Stated differently, the Court disagrees with the Superior Court's holding that the Ensure Condition is precatory, merely "mak[ing] a statement that appears consistent with the regulatory scheme" without imposing any compliance requirement upon the Authority.[130] Rather, the Ensure Condition describes one of the core standards of conduct to which an operator of a transfer station, like the Authority, will be held: the duty to ensure that all transporters hauling waste from the station have valid permits to transfer solid waste. This requirement is integral to the broader statutory and regulatory scheme governing solid waste, which focuses on requiring that all links in the waste disposal chain obtain permits.[131]

Furthermore, the Ensure Condition does not necessarily make the Investigate and Determine Condition redundant. Rather, these conditions can be reasonably interpreted to impose two separate duties that do not perfectly overlap. The Investigate and Determine Condition requires that the Authority "investigate and determine the current validity of [a transporter's] permit if [the Authority] has reason to suspect a permit is not valid."[132] The Authority could have a reason to *suspect* that a transporter did not have a valid permit even if that suspicion was incorrect because the transporter had a valid permit.

Finally, the Court disagrees with the Authority's suggestion that the Department has shifted its position on what Condition II.I.2 requires and how the Authority failed to live up

---

[130] *Id.* at *7.
[131] *See generally* 7 *Del. C.* § 6003(a)(4), (b)(5).
[132] A324.

to that standard of conduct.[133]  From the inception of this litigation, the Department has insisted that the Authority violated the *first sentence* of Condition II.I.2 (*i.e.*, the Ensure Condition) by failing to ensure that all transporters have valid permits to transport solid waste.[134]  This was true before the Board,[135] before the Superior Court,[136] and on appeal.[137]

Accordingly, the Court reverses the Superior Court's holding that Condition II.I.2 is void for vagueness.  Although perhaps not a model of clarity, a reasonable person in the Authority's position would recognize that the Authority had a strict liability obligation to ensure that all transporters had valid permits to transport solid waste.[138]

### 3. The Board must determine whether the record supports the penalty that the Secretary assessed the Authority

For the reasons provided above, the Court holds that the Superior Court and the Board erred by determining that Condition II.I.2 was unlawful.  The Secretary had the authority to impose Condition II.I.2, and the condition is not void for vagueness.

Further, the record before the Board establishes that the Authority violated Condition II.I.2.  There is no dispute that Contractors Hauling trucks transported solid waste

---

[133] *See* DSWA Answering Br. 22-23.

[134] *See* A292-93.

[135] *See* A4.

[136] B664 (arguing that the fact that Contractors Hauling transported waste from the Pine Tree Station without valid permits was sufficient to "establish that DSWA violated Condition II.I.2.").

[137] *See, e.g.*, DNREC Sur-Reply Br. 13.

[138] In addition to the points discussed above, the Authority argues that the Investigate and Determine Condition provides an unconstitutional delegation of enforcement authority.  DSWA Opening Br. 28-31.  The Secretary found that the Authority violated the Ensure Condition, not the Investigate and Determine Condition.  A292-94.  Accordingly, the Court does not address whether the Investigate and Determine Condition unconstitutionally delegates enforcement authority.

31

from the Pine Tree Station without valid permits,[139] violating the requirement under Condition II.I.2 that "[a]ll vehicles transporting waste from the Transfer Station shall have a valid solid waste transporters permit issued by the DNREC."[140]

The record before the Board therefore supports the Secretary's determination that the Authority violated Condition II.I.2 of the Pine Tree Station Permit by "fail[ing] over the course of several months to ensure that all vehicles that transfer waste from its [Pine Tree Station] possess a valid Delaware solid waste transporter permit."[141] Given this evidence, it would be a reversible error for the Board to overturn the Secretary's determination that the Authority was liable for violating the Ensure Condition of Condition II.I.2.

Unlike the penalties assessed against the G&F Group, the Board did not clearly rule that the Authority should not be penalized even if it violated Condition II.I.2. Instead, the Board seemed to rule that no penalty was appropriate because the Authority did not violate its permits.[142] Accordingly, the Court remands this appeal to the Superior Court. On remand, the Superior Court shall remand this appeal to the Board to determine whether the record supports the Secretary's penalty assessment. The Board shall carry out this review consistent with the standard of review and principles stated in Section III.B.1 of this opinion.

---

[139] *See* A6-10.
[140] A324.
[141] A292.
[142] *See* A10-11.

**B.** **The Superior Court Correctly Held that the Authority Was Strictly Liable for Violating the Reporting Conditions**

The Reporting Conditions require that the Authority submit an annual report to the Department detailing various aspects of operating the Pine Tree Station and Sandtown Landfill, including a list of transporters that hauled waste between the facilities.[143] The Secretary determined that the Authority violated the Reporting Conditions by submitting an incomplete list of transporters that failed to disclose that Contractors Hauling's trucks had transported waste from the Pine Tree Station to the Sandtown Landfill.[144]

Throughout this litigation, the Authority has insisted that it did not violate the Reporting Conditions because it did not have knowledge, contemporaneous with submitting the annual reports, that Contractors Hauling transported waste from the Pine Tree Station.[145] The Board agreed with this argument, holding that the Authority did not violate the Reporting Conditions because it did not know that Contractors Hauling transported waste.[146] The Superior Court reversed the Board's determination, holding that the Authority's knowledge was irrelevant because the Reporting Conditions are strict-liability conditions.[147] In reaching that conclusion, the court also defined the standard of review that the Board applies to the Secretary's final decisions regarding enforcement.[148]

---

[143] A328; A354.

[144] A292-93.

[145] *See, e.g.*, A5.

[146] A11-12.

[147] *Del. Dep't of Nat. Res.*, 2020 WL 495210, at *8-9.

[148] *Id.* at *8.

The Department and the Authority have both appealed the Superior Court's decision. The Department argues that the Superior Court articulated an incorrect standard of review[149] but properly reversed the Board's holding that the Authority did not violate the Reporting Conditions.[150] The Authority argues that the Superior Court articulated the correct standard of review[151] but erroneously reversed the Board's holding that the Authority did not violate the Reporting Conditions.[152]

> **1. Under 7 *Del. C.* § 6008, the Board reviews the Secretary's Orders to determine whether they are supported by the evidence, free of legal error, and do not abuse discretion**

Appellants challenged the Secretary's Orders under 7 *Del. C.* § 6008(a), which allows "[a]ny person whose interest is substantially affected by any action of the Secretary" to file an administrative appeal with the Board. Relying on *Tulou v. Raytheon Services Co.*,[153] the Superior Court held that because "the initial adversarial hearing was before the Board, . . . the Board was not required to provide 'explicit deference to the Secretary's expertise'" and therefore "did not commit an error of law in reviewing the Secretary's decision that DSWA had violated [the Reporting Conditions]."[154] The parties dispute the applicable standard of review the Board must apply when analyzing the Secretary's conclusions.

---

[149] DNREC Answering Br. 17-21.

[150] *Id.* at 54-58.

[151] DSWA Reply Br. 5-9.

[152] DSWA Opening Br. 32-36.

[153] 659 A.2d 796, 804-06 (Del. Super. Ct. 1995).

[154] *Del. Dep't of Nat. Res.*, 2020 WL 495210, at *8.

The plain language of § 6008(b) puts this standard-of-review dispute to rest. Where the appellant challenges "a final decision of the Secretary concerning . . . any permit or enforcement action," the statute provides that "[t]he burden of proof is upon the appellant to show that the Secretary's decision is not supported by the evidence on the record before the Board."[155] The record before the Board consists of the "entire record" that was before the Secretary and any other "competent evidence" that the parties produce during the appeal.[156] Thus, the Board reviews the Secretary's enforcement decision to determine whether it is supported "by the evidence before the Board." If the appellant fails to carry this burden, the Secretary's final decision stands.

Appellants argue that the above analysis is wrong because § 6008(b) does not instruct the Board to defer to the Secretary when considering appeals of enforcement decisions. This argument ignores the statement in § 6008 that "[t]he burden of proof is on the appellant to show that the Secretary's decision is not supported by the evidence," a clear instruction that the Board must defer to the Secretary's decision unless the record before the Board—which can include evidence not before the Secretary—does not support that decision.[157]

The statute's use of the term "burden of proof" does not alter this analysis. Providing that the appellant bears the burden of proving that the evidence does not support the Secretary's decision is equivalent to providing that the Board reviews the Secretary's

---

[155] *See* 7 *Del. C.* § 6008(b).
[156] *Id.*
[157] *Id.*

decision to determine whether it is supported by the evidence. Under either framing, the Board must not overturn the Secretary's decision unless the evidence before the Board does not support that decision.

The statutory language of § 6008(c) reinforces the Court's analysis. Under § 6008(c), "Regulations will be presumed valid, and *the burden* will be upon the appellant to show that the regulations are arbitrary and capricious, or adopted without a reasonable basis in the record." Although referring to the appellant's "burden," this provision clearly articulates the Board's standard of review, providing that the Board reviews regulations to determine, *inter alia*, whether those regulations are "arbitrary and capricious, or adopted without a reasonable basis in the record."[158] This language mirrors the standard of review that Delaware courts apply to challenges to regulations.[159] Thus, § 6008(c) suggests that the Assembly used the word "burden" to refer to the Board's standard of review.

The language of § 6008(g) further strengthens this analysis. Under § 6008(g), parties can agree to a stipulation circumventing the Board and proceeding directly to the Superior Court. In such cases, the statute provides "[t]he *standard of review* for such an appeal shall

---

[158] *Id.*

[159] *See* 29 *Del. C.* § 10141(e) ("Upon review of regulatory action, the agency action shall be presumed to be valid and the complaining party shall have the burden of proving either that the action was taken in a substantially unlawful manner . . . or that the regulation, where required, was adopted without a reasonable basis on the record or is otherwise unlawful."); *Del. Dep't Nat. Res. & Envtl. Control v. Sussex C'ty*, 34 A.3d 1087, 1089 (Del. 2011) (relying on § 10141(e) for the standard of review when assessing a challenge to the Department's duly promulgated regulations).

be governed by subsections (b) and (c) of this section."[160] This language implies that § 6008(b) and (c) each contain a standard of review that the Superior Court can apply. The only language in § 6008(b) that could function as a standard of review is the statement that the "burden of proof is on the appellant to show that the Secretary's decision is not supported by the evidence." Thus, § 6008(g) reinforces the Court's conclusion that § 6008(b) instructs the Board to apply a "supported by the evidence" standard of review to the Secretary's enforcement decisions.

Appellants and the court below rely on the Superior Court's opinion in *Tulou*, which opined that it would be an "absurd result" to apply the same standard of review to the Secretary's decision regardless of whether the Secretary or the Board held the initial adversarial hearing.[161] The *Tulou* opinion is distinguishable because it addresses whether the Board should apply *more* deference where the Secretary holds the initial evidentiary hearing.[162] This does not squarely address whether the Board should apply less deference when the Board holds the initial evidentiary hearing, as was the case here.

Nonetheless, to the extent *Tulou* holds the Board owes the Secretary less deference when the Board conducts the initial evidentiary hearing, the Court disagrees and reverses that holding. It may be logical to construct such a statutory scheme, but the statute the legislature passed does not include any language drawing a distinction between one- and

---

[160] *See* 7 *Del. C.* § 6008(g).
[161] 659 A.2d at 805.
[162] *See id.*

37

two-hearing appeals.[163]  Thus, the statute's plain language does not support applying less deference to the Secretary's enforcement decisions where the Board holds the initial evidentiary hearing.

> ## 2. The Authority is strictly liable for violating the Reporting Conditions

The Reporting Conditions require that the Authority submit an annual report providing "[a] list of transporters that hauled waste to and from the facility during the year covered by the report."[164]  The Secretary's Order determined that the Authority violated the Reporting Conditions by failing to disclose that Contractors Hauling transported waste from the Pine Tree Station to the Sandtown Landfill.[165]  The Board reversed the Secretary's conclusion on the basis that the Authority "could not report that G&F was using vehicles owned by an affiliate in its Annual Report because it had no knowledge until after the Report was filed."[166]  The Superior Court reversed the Board's determination, holding that the Authority's lack of knowledge was irrelevant because the Reporting Conditions make the Authority strictly liable for compiling a complete list of transporters.[167]  Thus, we must determine whether the Reporting Conditions hold the Authority strictly liable for reporting

---

[163] *See* § 6008(b).
[164] A328; *see* A354.
[165] A293.
[166] A11.
[167] *Del. Dep't of Nat. Res.*, 2020 WL 495210, at *8-9.

all of the transporters that hauled waste from the Pine Tree Station to the Sandtown Landfill or whether the Reporting Conditions only require a list of known transporters.

The Reporting Conditions exist to ensure that the Authority generates, and provides to the Department, pertinent information about its operations, including "[a] list of commercial haulers that hauled waste to and from the facility during the year covered by the report."[168] The conditions do not include any language describing the Authority's state of mind,[169] and the absence of such language makes sense. Grafting a knowledge requirement could create an incentive for the Authority to remain ignorant, undermining the Department's efforts to obtain information about the Authority's operations. It would also reward the Authority for failing to do what the Reporting Conditions require: generating information about the transporters hauling waste to and from the Authority's facilities. Thus, the Court holds that the Reporting Conditions make the Authority strictly liable for providing the Department with a complete list of transporters.

The Court also agrees with the Superior Court's determination that *Dover Products Co. v. Olney* is inapposite.[170] The issue in *Dover Products* was whether the regulated party caused the violation, not whether the regulated party could be held liable for a violation of

---

[168] A328 (the Pine Tree Station Permit's reporting condition). The Sandtown Landfill Permit's reporting requirement is nearly identical, requiring "[a] list of transporters that hauled waste to or from the facility." A354.
[169] *See* A328; A354.
[170] 428 A.2d 18 (Del. 1981).

which it was unaware.[171]  In this case, there is no question that the Authority violated the Reporting Conditions by submitting an incomplete list of solid waste transporters.[172] Therefore, the Authority cannot establish a lack-of-causation defense, and the *Dover Products* opinion is inapposite.  Accordingly, the Court affirms the Superior Court's holding reversing the Board's determination.  The record before the Board supports the Secretary's determination that the Authority violated the Reporting Conditions.

Finally, the Authority raises two sub-issues that the Court must briefly address.  First, the Authority has repeatedly claimed that holding it liable for reporting information it did not know penalizes the Authority for "failing to do what is factually impossible:  to report information not within DSWA's knowledge."[173]  This argument ignores the steps leading up to submitting the report that could have—and perhaps should have—allowed the Authority to learn that Contractors Hauling was transporting waste from the Pine Tree Station.  It was only factually impossible for the Authority to report that Contractors Hauling transported waste because the Authority failed to take the steps necessary to comply with the Reporting Conditions.  Had the Authority properly looked for this information, it could have been found.  Accordingly, the Court rejects the Authority's impossibility argument.

Second, the Authority suggests that the Board's determination that the Authority did not violate the Reporting Conditions is a factual conclusion to which the Superior Court, and

---

[171] *Id.* at 18-19.
[172] *See* A11.
[173] DSWA Opening Br. 35.

this Court, must defer.[174] The Court disagrees with the Authority's analysis. No one disputes whether the Authority possessed knowledge that Contractors Hauling transported waste during the relevant reporting period. This is because the Authority's knowledge was irrelevant to the question of whether the Authority violated the strict liability Reporting Conditions. The Board's conclusion that knowledge was relevant was an error of law, not an erroneous factual conclusion.

### C. The Superior Court Erred by Reversing the Board's Determination that G&F Group Should Not Be Assessed Penalties

The Secretary determined that G&F violated 7 *Del. Admin. C.* § 1301-7.1.7 by allowing Contractors Hauling, which did not have valid permits, to transport solid waste from the Pine Tree Station and assessed a $14,800.00 penalty pursuant to 7 *Del. C.* § 6005(b)(3).[175] Similarly, the Secretary determined that Contractors Hauling violated 7 *Del. C.* § 6003(a)(4) and 7 *Del. Admin. C.* § 1301-7.1.1 by transporting solid waste without a valid permit.[176]

The Board affirmed the Secretary's determinations that the G&F Group violated applicable regulatory and statutory requirements.[177] Nonetheless, the Board reversed the Secretary's assessment of penalties, finding that penalties were inappropriate because the violations were the result of "understandable oversight" or an "innocent lack of

---

[174] *Id.* at 33.
[175] A305-06.
[176] A314.
[177] A12-13.

communication" and did not harm the environment.[178]  The Superior Court reversed the Board, holding that because the G&F Group was strictly liable for violating the applicable regulatory and statutory requirements, the Board's conclusion that penalties were inappropriate was "not well-considered."[179]  Thus, the court "remand[ed] the matter of the appropriate administrative penalties to be assessed against G&F and [Contractors Hauling] to the Board."[180]

The G&F Group argues that the Superior Court erred by conflating strict liability for violations under 7 *Del. C.* § 6005(b) with the permissive administrative penalties under the same provision.[181]  The Department answers that the Board erred by setting aside the penalties that the Secretary assessed against the G&F Group.[182]  The Department's core argument is that the Board erred by failing to apply any deference to the Secretary's determinations regarding the appropriate penalties.[183]

Under § 6005, the Secretary has the discretion to impose penalties for violations after considering various discretionary factors, including culpability:

> In his or her discretion, the Secretary may impose an administrative penalty of not more than $10,000 for each day of violation . . . .  Assessment of an administrative penalty shall be determined by the nature, circumstances, extent and gravity of the violation, or violations, ability of violator to pay, any prior

---

[178] A13.

[179] *Del. Dep't of Nat. Res.*, 2020 WL 495210, at *10.

[180] *Id.*

[181] G&F Group Opening Br. 20-25.

[182] DNREC Answering Br. 22-25.

[183] *Id.* at 23-24.

history of such violations, the degree of culpability, economic benefit or savings (if any) resulting from the violation and such other matters as justice may require.[184]

This authorizing statute expressly instructs the Secretary—and, by extension, the Board—to consider a host of factors when determining the appropriate penalty.[185] The Secretary's Orders, however, did not provide any analysis of why the penalties assessed against the G&F Group were appropriate in light of the discretionary factors listed in § 6005(b)(3).[186] Rather, the orders appear to rely on the assertion that the penalties assessed were appropriate because the G&F Group committed violations.[187] Thus, the Secretary did not provide the Board with a final decision to which it could defer regarding *why* the penalties assessed were appropriate.

Faced with this bare record, the Board reviewed for the first time whether penalties were appropriate in light of the discretionary factors that § 6005(b)(3) lists, including "the degree of culpability" and the "nature, circumstances, extent and gravity of the violation." Applying these factors, the Board concluded that the record did not support a penalty because the violations were not culpable and did not harm the environment.[188]

---

[184] 7 *Del. C.* § 6005(b)(3).

[185] *Id.*

[186] *See* A304-10 (the Secretary's Order issued to G&F); A312-18 (the Secretary's Order issued to Contractors Hauling).

[187] *See* A305-06 (failing to explain why the penalty assessed against G&F was appropriate); A314 (failing to explain why the penalty assessed against Contractors Hauling was appropriate).

[188] A12-13.

Further, the statute allows the Board to overturn the Secretary's assessment of penalties and does not create a special standard for reviewing penalty assessments. Under § 6005(b)(3), a party assessed a violation can request a public hearing and appeal before the Board, which "shall be conducted pursuant to §§ 6006-6009 of this title." In addition to establishing the "supported by the evidence" standard of review discussed above,[189] § 6008(b) provides that "[t]he Board may affirm, *reverse* or remand . . . any appeal of a case decision of the Secretary."[190] Thus, the Board had clear statutory authority to reverse the Secretary's determinations, including the assessment of administrative penalties.

The Superior Court may have been correct in its observation that the Board's decision to overturn the penalties assessed against the G&F Group was "not well-considered."[191] Nonetheless, the question before the court was whether substantial evidence supported the Board's decision,[192] not whether that decision was correct. For the reasons provided above, the Court holds that substantial evidence supported the Board's determination that the G&F Group should not be penalized. Accordingly, the Court reverses the Superior Court's holding, which reversed the Board's determination that the record did not support the penalties the Secretary assessed against the G&F Group.

---

[189] *See supra*, Part III.B.1.
[190] (emphasis added).
[191] *Del. Dep't of Nat. Res.*, 2020 WL 495210, at *10.
[192] *Coastal Barge Corp. v. Coastal Zone Indus. Control Bd.*, 492 A.2d 1242, 1244 (Del. 1985).

**D.** **The Superior Court Properly Held that the Department's Ability to Recover Costs Was Not Before the Board**

The Secretary's Orders assessed costs against the Appellants pursuant to 7 *Del. C.* § 6005 for failing to ensure that all transporters had valid permits,[193] providing the Department with an incomplete list of transporters,[194] subcontracting with a transporter that did not have a valid permit,[195] and transporting solid waste without a permit.[196] Under § 6005(c)(1), the Secretary has the power to hold any person that violated a permit condition or environmental regulation liable for "all expenses incurred by the Department," including the costs of abating and investigating the violation. To properly assess costs, the Secretary must "submit a detailed billing of expenses to the liable person."[197]

The Board held that the Department could not recover costs for the same reasons that administrative penalties were inappropriate: the Authority did not violate its permits and the G&F Group's violations were not sufficiently culpable to justify the assessment of costs.[198] The Superior Court reversed the Board's determination, holding that "the Secretary's cost recovery decisions were not properly before the Board on appeal, and [therefore] the Board did not have authority to review them."[199] The court reasoned that the Secretary's ability to recover costs was not before the Board because the Secretary had not submitted a "detailed

---

[193] A291-93 (the Secretary's Order addressing the Authority).
[194] A292-93.
[195] A305-06 (the Secretary's Order addressing G&F).
[196] A314 (the Secretary's Order addressing Contractors Hauling).
[197] *Id.*
[198] A11-13.
[199] *Del. Dep't of Nat. Res.*, 2020 WL 495210, at *5.

45

billing of expenses," and the Department represented that it was "not formally seeking cost recovery from [the Appellants]."[200]

The parties agree that the Department's ability to recover costs was not properly before the Board, and therefore the Superior Court properly overturned the Board's decision with respect to costs.[201] Nonetheless, the parties advance various arguments regarding the Secretary's ability to assess costs that *could* be relevant *if* the Secretary ultimately decides to submit a detailed bill and hold the Appellants liable for costs.[202] The Court declines to issue an advisory opinion regarding the parties' arguments and, therefore, does not address the other legal issues that the parties raise concerning the Secretary's ability to assess costs.

## IV.   CONCLUSION

For the reasons provided above, the Court AFFIRMS-in-PART, REVERSES-in-PART, and REMANDS-in-PART the Superior Court's January 29, 2020 decision. On remand, the Superior Court shall remand this appeal to the Board to determine whether the record supports the penalty that the Department assessed against the Authority.

---

[200] *Id.* (citation omitted).
[201] DNREC Answering Br. 26 ("As an initial matter, the Department maintains that the Superior Court correctly held that 'the Secretary's cost recovery decisions were not properly before the Board on appeal, and the Board did not have authority to review them . . . ."); DSWA Reply Br. 15 ("DNREC asks this Court to rule on two issues: whether DNREC may make a second attempt at cost recovery, and if so, whether the Board has jurisdiction to review that second cost assessment attempt. These issues are unripe."); G&F Group Reply Br. 18-19 ("DNREC waived its right to recover costs at a later time by failing to brief or argue this point before the Superior Court.").
[202] *See* DNREC Answering Br. 26-30; DSWA Reply Br. 14-17; G&F Group Reply Br. 16-18.